102 F.3d 664
 65 USLW 2455
 Winfred L. MAXWELL, Plaintiff-Appellee,
v.
CITY OF NEW YORK; the New York City Police Department;
Timothy Morley, Police Officer; Angel DeJesus, Police
Officer; Monserrate Badillo, Police Officer; Davie Arroyo,
Police Officer; Daniel Gonin, Police Sergeant; Richard Van
Leuvan, Police Sergeant; and George Vasta, Police
Detective, Defendants,
William Bratton, as Police Commissioner of the New York City
Police Department; Thomas Kelly, Police Lieutenant; Philip
Lee, Police Inspector; and Thomas Gallagher, Police Chief,
Defendants-Appellants.
 No. 676, Docket 95-7464.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 11, 1995.
Decided Dec. 17, 1996.
 
 Elaine R. Rothenberg-Witcoff, Assistant Corporation Counsel, New York City (Paul A. Crotty, Corporation Counsel and Larry A. Sonnenshein, of counsel), for Defendants-Appellants.
 Ted E. Trief, Trief & Olk, New York City (Nelson M. Farber, of counsel), for Plaintiff-Appellee.
 Before: OAKES, WINTER, and WALKER, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 This appeal involves the constitutionality of a vehicle checkpoint. Winfred Maxwell, a retired New York City police officer, brought this action against the city of New York and various police officials and officers for alleged violations of his constitutional and civil rights, under 42 U.S.C. §§ 1983, 1985(3), and 1986, and for corresponding violations of state law. Maxwell's twenty-eight count amended complaint alleges, inter alia, that in going to visit his daughter, he was stopped by police at a barricaded vehicle checkpoint. He claims that the existence of the checkpoint and resultant stop violated his Fourth Amendment right to be free from unreasonable searches and seizures. Maxwell further alleges that various police officers at the checkpoint used excessive force against him and illegally arrested, detained, and prosecuted him.
 
 
 2
 Appellants, Police Commissioner William Bratton, Lieutenant Thomas Kelly, Inspector Philip Lee, and Chief Thomas Gallagher, were responsible only for planning and ordering the establishment of the checkpoint. They were denied qualified immunity by Judge Mukasey on Maxwell's claim for monetary damages for alleged Fourth Amendment violations in ordering the checkpoint. We hold that establishing the particular vehicle checkpoint without more did not violate Maxwell's Fourth Amendment rights and reverse.
 
 BACKGROUND
 
 3
 During the spring and summer of 1992, street crime, including four drive-by shootings, escalated in the Soundview neighborhood of the Bronx. In response, the 43rd precinct instituted the so-called Watson Avenue Special Operation. This involved a temporary vehicular checkpoint in an eight square-block narcotics-ridden area where most of the drive-by shootings had taken place. The checkpoint was to be active three days a week on a random basis and for approximately six hours a day, primarily in the evening hours. When the checkpoint was in operation, officers manning the barricade were to stop every vehicle seeking to enter the area in order to ascertain the driver's connection to the neighborhood. Drivers who approached the checkpoint were to be allowed to avoid questioning by driving around the area or by parking their cars and entering the area on foot. Area residents and commercial vehicles were to be allowed into the neighborhood. Officers manning the barricades were verbally instructed that they could also allow cars dropping off small children or visiting the local church to enter the area. Other than that, vehicles were not permitted beyond the barricades. The operation was in effect for six weeks, between August 26 and October 10, 1992.
 
 
 4
 In the early evening of September 19, 1992, Maxwell sought to drive to his daughter's house, which was in the barricaded area.[1] At the checkpoint Maxwell was directed by Officer Timothy Morley to stop the vehicle and to produce his driver's license and registration. Maxwell alleges that he informed Morley that he was a retired police officer and that the pouch in which he kept his license and registration also contained a registered handgun. He then reached for the pouch and opened it. Upon observing the firearm, Morley drew his service revolver and ordered Maxwell out of the vehicle. Maxwell alleges that he complied but that Morley nevertheless flipped him to the ground and made "unlawful physical contact" with him. A squad car of back-up officers soon arrived. Maxwell alleges that the officers unlawfully beat him, kicked him, punched him, and stepped on his neck. Thereafter, the officers handcuffed Maxwell and took him into custody. Maxwell claims that at this point he turned to one of the officers and said, "Sarge, look in the bag, I'm a retired police officer." To which the officer allegedly replied, "I don't care. As far as I'm concerned you're a Nigger Dirtbag." Maxwell was then taken by the officers to a station house where he was charged with Assault in the Second Degree, Resisting Arrest, Disorderly Conduct, and Harassment. He was detained until his arraignment the following day after which he was released. A jury acquitted Maxwell on all charges.
 
 
 5
 Maxwell filed the instant action alleging violations of his civil and constitutional rights as well as various state law claims. The district court granted the defendants' motion for partial summary judgment with respect to various claims but declined to dismiss Maxwell's Fourth Amendment claim for monetary damages for being stopped--apart from being arrested and beaten --at the checkpoint. Maxwell's excessive force, illegal detention, and certain other claims were not the subject of the summary judgment motion and remain pending.
 
 
 6
 The district court also denied appellants' motion that the complaint be dismissed as to Bratton, Kelly, Lee, and Gallagher on the ground of qualified immunity. They were of course involved only in planning and ordering the checkpoint and not in the arrest and alleged beating of Maxwell. In denying the motion, Judge Mukasey stated that "Because [Maxwell's claim for monetary damages based on alleged Fourth Amendment violations] must proceed to trial, it cannot be determined at this stage whether plaintiff suffered any violation of his constitutional rights. Further, if plaintiff's version of the facts proves true, and the officers did not provide adequate instructions on how to operate the checkpoints, qualified immunity will not protect them." Therefore, the court held that summary judgment was inappropriate and that the issue of qualified immunity must proceed to trial. This interlocutory appeal followed.
 
 DISCUSSION
 
 7
 Only the district court's denial of the qualified immunity defense as to the four appellants is before us. We review a district court's denial of summary judgment de novo. Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir.1993).
 
 
 8
 The district court denied qualified immunity in the belief that genuine questions of material fact exist as to whether the vehicle checkpoint itself--in contrast to the alleged misconduct of the officers manning the checkpoint--violated Maxwell's constitutional rights. Appellants are entitled to qualified immunity if either the checkpoint in question did not violate clearly established federal rights, see Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982), or it was objectively reasonable for defendants to believe their conduct was lawful, see Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 3039-40, 97 L.Ed.2d 523 (1987). The threshold inquiry is, of course, whether the plaintiff has alleged a constitutional violation at all. See Siegert v. Gilley, 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991); Blue v. Koren, 72 F.3d 1075 (2d Cir.1995).
 
 
 9
 In Michigan Department of State Police v. Sitz, the Supreme Court held that a Fourth Amendment " 'seizure' occurs when a vehicle is stopped at a checkpoint." 496 U.S. 444, 450, 110 S.Ct. 2481, 2485, 110 L.Ed.2d 412 (1990); see also People v. Scott, 63 N.Y.2d 518, 524, 473 N.E.2d 1, 483 N.Y.S.2d 649 (1984) ("There is ... no question that a roadblock or checkpoint is a seizure within the meaning of the Fourth Amendment.") The reasonableness of a seizure at a vehicle checkpoint depends upon a balancing of (i) the gravity of the public concerns served by the checkpoint; (ii) the degree to which the checkpoint effectively addresses those concerns; and (iii) the severity of the intrusion upon individual liberty. Sitz, 496 U.S. at 448-49, 110 S.Ct. at 2484-85 (citing Brown v. Texas, 443 U.S. 47, 50-51, 99 S.Ct. 2637, 2640-41, 61 L.Ed.2d 357 (1979)). We conclude that, as planned, the Special Operation passed constitutional muster.
 
 
 10
 First, the checkpoints in question served an important public concern in attempting to deter drive-by shootings that were, or were reasonably perceived to have been, connected with widespread drive-up drug purchases. Second, at the time of implementation, the checkpoints were reasonably viewed as an effective mechanism to deter criminal behavior in the barricaded area. Indeed, checkpoints similar to the one here had been effectively used in the past by the New York City Police. See Sitz, 496 U.S. at 453-54, 110 S.Ct. at 2486-87 (in order to satisfy the effectiveness prong, a checkpoint need only be one reasonable method of deterring the prohibited conduct; it need not be the most effective measure).
 
 
 11
 Third, the intended level of intrusion to motorists was minimal. No vehicle was to be stopped or its operation questioned unless entry into the cordoned-off area was desired. For those seeking entry, the stop was meant to be brief and was aimed solely at ascertaining the motorists' connection to the neighborhood. In United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), the Supreme Court held that a checkpoint aimed at interdicting the flow of illegal aliens which involved "only a brief detention of travelers during which all that [was] required of the vehicle's occupants [was] a response to a brief question or two and possibly the production of a document evidencing a right to be in the United States" was not sufficiently intrusive so as to violate the Fourth Amendment. Id. at 558, 96 S.Ct. at 3083 (internal quotation marks omitted). Here, as in Martinez-Fuerte, the request for evidence of a legitimate reason to enter the barricaded area was not significantly intrusive. Moreover, because the plan here was to stop all motorists seeking entry, there was little concern that the stop would generate "fear and surprise." Sitz, 496 U.S. at 452-53, 110 S.Ct. at 2486-87; Martinez-Fuerte, 428 U.S. at 558, 96 S.Ct. at 3083 (where motorist can see that other vehicles are being stopped and can see visible signs of the officers' authority, there is less likelihood of fright or annoyance).
 
 
 12
 Maxwell next argues that even if stopping those who wanted to enter the Soundview area was valid, the plan empowered the officers with excessive discretion to turn people away and was therefore sufficiently intrusive to constitute a Fourth Amendment violation. In that regard, Maxwell cites the testimony of one sergeant that the decision to permit or forbid an individual vehicle's entry "just comes down to the officer's preference." However, the instructions given allowed all residents and commercial vehicles to enter, as well as persons dropping off little children or visiting the church. It is true that discretion was to govern the inevitable myriad of other circumstances that might arise, but we know of no way to catalogue each of those circumstances in advance and to provide a litmus test to resolve them. We believe that the instructions were as detailed as was reasonably possible and, therefore, were constitutionally adequate.[2]
 
 
 13
 We emphasize the discretion afforded went only to the decision to permit or deny vehicular entry into the area, not to the detention of persons in the vehicles. Police roadblocks need not be based on reasonable suspicion of particular drivers, see Martinez-Fuerte, 428 U.S. at 556, 559-60, 96 S.Ct. at 3082, 3083-84, but the detention of particular motorists beyond the initial stop "may require satisfaction of an individualized suspicion standard." Sitz, 496 U.S. at 451, 110 S.Ct. at 2485; see also Martinez-Fuerte, 428 U.S. at 566-67, 96 S.Ct. at 3087 ("The principal protection of Fourth Amendment rights at checkpoints lies in appropriate limitations on the scope of the stop.") Thus, once the initial stop has been conducted, the decision to further detain a motorist must be based on particularized reasonable suspicion. See Terry v. Ohio, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968); United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989). Our decision does not, therefore, affect Maxwell's claims regarding events after the initial stop.
 
 
 14
 We conclude that summary judgment should have been granted as to the four appellants and reverse.
 
 OAKES, Senior Circuit Judge, dissenting:
 
 15
 I find it surprising that the majority holds--particularly at the summary judgment level--that the police operation here in question does not implicate the Fourth Amendment. I have long agreed with the thesis put forth by Professor Anthony Amsterdam in his Holmes Lectures at the University of Minnesota Law School[1] that "the Fourth Amendment requires all police search and seizure activity to be regulated by legal directives that confine police discretion within reasonable bounds."[2] Accordingly, I dissent.
 
 
 16
 The majority characterizes this as a stop by police "at a barricaded vehicle checkpoint." But the "checkpoint" here is quite different from the sobriety checkpoint upheld in Michigan Department of State Police v. Sitz, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), or the alien checkpoint initially upheld in United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). While the district court and the majority here may ultimately be upheld in evaluating the scheme in question under the three-pronged balancing test enunciated in Brown v. Texas, 443 U.S. 47, 50, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979) (gravity of crimes alleged to require checkpoint, effectiveness of checkpoint in curtailing crimes, and level of intrusion on drivers' privacy caused by checkpoint), appropriate balancing and other analysis requires a more specific account of what this procedure involved. The Operation in question functioned only between August and October, 1992, and was known as the "Watson Avenue Special Operation" in the Bronx's 43rd Police Precinct. It was developed with the goal of combatting, in a specific eight-square block area, various crime problems including drug trafficking, robberies, and random drive-by shootings. The Operation occurred three days per week on a random basis for approximately seven hours a day between approximately 4 o'clock in the afternoon and 11 o'clock at night, until September 23, 1992. It was then extended until October 10, and on selected days ran as late as 2 a.m., because drug dealers had adjusted their activities to avoid coinciding with the Operation. It involved police barricades which were erected in a "frozen zone" between Watson Avenue and Westchester Avenue, including the side streets from Stratford Street to Elder Street, and including also the side streets Manor, Ward, and Boynton between Stratford and Elder. All motorists seeking access into the frozen zone encountered the manned police barricades, and while appellants' brief asserts, and the district court found, that drivers who wished to avoid any police interrogation could drive around the area blocked by the barriers, there was no access point enabling a driver to enter the frozen zone without first being stopped by a barricade. The plaintiff alleges that he, a former New York City police officer, was seeking to visit his daughter who lived within the zone, and he was accompanied by a passenger who lived within the zone. So, let it be very clear that what we are talking about is a cordoned-off area--to be sure, a high-crime area as well--that anyone wishing to enter had to be permitted to pass through by the police officers on duty. Additionally, since markings were not posted on the roads leading up to the checkpoints, motorists had no actual knowledge of the particular checkpoint until approaching the barricades.
 
 
 17
 What were the rules by which this Operation was set up? The July 30 memorandum by Police Lieutenant Kelly, the apparent architect of the Operation, provided that "barriers will be set up on side streets feeding into Watson Avenue in order to discourage drive-up purchasers from patronizing local dealers. Area residents will be allowed to enter the target area...." There were no written standards explaining which persons could and could not enter the frozen zone other than that memorandum and a memorandum of August 24, 1994, from the 43rd Precinct Commander DeRienzo to detail supervisors. That latter memo advised: "Supervisors will inform Officers manning barriers that area residents will be allowed to pass through the area, as well as delivery trucks. Those individuals who do not have a legitimate reason to enter will be instructed to utilize other routes...." Needless to say, what was or was not a "legitimate reason" depended upon the field officer's subjective evaluation. This was conceded by Kelly himself, who also conceded that a motorist could be denied access even if the officer lacked probable cause or reasonable suspicion to believe that a vehicle's occupants were engaged in crime; in other words, motorists could not enter the frozen zone unless they "could come up with a reasonable excuse" as to what they were going to do in the area. Thus, law abiding citizens--you or I--could be turned away at the checkpoint officer's discretion, while even passengers in a car fitting a description of drive-by shooters might be allowed to pass if the driver said he was visiting a friend in the area and could provide his friend's correct address. On the positive side, a delivery truck, a car full of children, a vehicle driven by a local store owner, or a car dropping off visitors to a local church might be allowed to pass through the barricade even if the driver lacked adequate documentary proof that he lived in the neighborhood. These, at least, were examples given at rollcall by Kelly of non-residents who would be allowed vehicular entry into the frozen zone. Sergeants were instructed that the barricade had to be manned and "if ... the officers assigned had a question, they would handle it." The Bronx Borough Commander testified that "it's basically a subjective determination made by the officer as to which persons would be let in." A supervising sergeant testified that a motorist would be denied access "if he started giving a cock-and-bull story," and added that, "[i]t just comes down to the officer's preference." The purpose of the barricade was, as he said, "to keep people you don't want in, out." Another supervising sergeant testified that the checkpoint officer would have to use "discretion ... to size up the situation" while the motorist seeking entry "would have to convince the officer it was a legitimate visit." Indeed, the sergeant who gave operating instructions to the young, inexperienced police officer who stopped the plaintiff-appellee in this case testified that he had not received guidance from architect Kelly in the use of discretion, and, in turn, the sergeant did not offer such guidance to the officers under his supervision. The arresting officer himself testified that he was not instructed how to reply if a motorist stated that he or she did not live in the zone but was visiting a friend or relative. He said he guessed he would let such a person through if the motorist agreed to provide his license and registration and his friend's address within the zone, but he didn't know the answer to the question whether he would let the person through if the motorist refused to provide the friend or relative's name.
 
 
 18
 The district court, in denying summary judgment on the plaintiff's ninth claim seeking monetary damages for the alleged violation of his Fourth Amendment rights, found that "the facts as currently presented relating to the second [Brown v. Texas ] inquiry in this three-part test--the effectiveness of the checkpoints--are incomplete and in dispute," thereby holding that the cross-motions for summary judgment should be denied. While the Supreme Court in Sitz, 496 U.S. at 454, 110 S.Ct. at 2487, made it clear that an in-depth statistical examination of a checkpoint's "effectiveness" is not warranted, there still must be some means beyond subjective evaluations by neighborhood residents of measuring whether the checkpoint reasonably advanced its stated purpose. While I agree with Judge Mukasey that only after trial could a factual determination properly be made and that portion of the test correctly be applied, and indeed until the threshold question of whether a "seizure" actually took place is resolved, it would be impossible to determine whether the frozen zone here could pass constitutional muster.
 
 
 19
 However, I agree with plaintiff-appellee that entrance to the frozen zone was left to the arbitrary determination of officers in the field with no meaningful written standards of how to exercise their discretion: the "legitimate reason to enter" mentioned in the August 24 memorandum is another way of saying that the individual officer had total discretion. And it is this unfettered discretion that makes the majority's resolution of the case, in my view, totally unsound. I say this because it seems to me that the Fourth Amendment is--or, in any event, should be--about controlling such discretion. This is a point I have tried to make in several opinions, the first for the court in a border stop case, United States v. Barbera, 514 F.2d 294 (2d Cir.1975), as well as in dissent in an airport search case, United States v. Vasquez, 612 F.2d 1338, 1352 (2d Cir.1979), and in concurrence in another airport search case, United States v. Place, 660 F.2d 44, 53 (2d Cir.1981), aff'd 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983).[3] I have also made the point in other contexts that involve the "exigent circumstances" exception in United States v. Cattouse, 846 F.2d 144, 148 (2d Cir.1988) (dissent); United States v. Martino, 664 F.2d 860, 878 (2d Cir.1981) (concurrence) ("To the individual law enforcement officer, the circumstances for a warrantless search and seizure always appear exigent,") and bus stop searches in Buffalo, United States v. Glover, 957 F.2d 1004, 1015 (2d Cir.1992) (dissent). What I am concerned about is the taking of an "atomistic" approach to the Fourth Amendment as opposed to a "regulatory" approach. Amsterdam, supra n. 1, at 438. In effect, this leaves, in James Otis's phrase, "the liberty of every man in the hands of every petty officer." See Legal Papers of John Adams, 168 (1965). I do not think that the Fourth Amendment is simply a "collection of protections of atomistic spheres of interest of individual citizens," Amsterdam, supra n. 1, at 367, but, rather, that it should be treated as "a regulation of governmental conduct." Id. In other words, I think that when the Fourth Amendment speaks of "[t]he right of the people," it is not talking about simply the personal rights of isolated individuals but may well be speaking of "the people" as in "We, the People." The true purpose of the Amendment is to control the police when police techniques are susceptible to making unwarranted intrusions on the person being interrogated, investigated, stopped, or whatever. To my mind, the decision today goes a long way toward putting the stamp of judicial approval on overly-discretionary police practices. Unfortunately, it does so unnecessarily because here the factual record was, in a very capable district judge's view, insufficiently developed to permit coming to sound conclusions in several respects. In this sense, the majority is essentially giving the New York City Police Department a judicial blank check to conduct similar "special operations."
 
 
 
 [1]
 Maxwell claims that, prior to arriving at the checkpoint, he observed no posted markings alerting him that he was approaching such a barricade and had no opportunity to avoid being stopped and questioned. Whether a failure to allow drivers to avoid the checkpoint might violate a driver's rights is not before us because Maxwell wanted to enter the area by car
 
 
 [2]
 We also note that simply turning away a vehicle when no legitimate reason for entry is given may not constitute a search or a seizure for Fourth Amendment purposes. In order for there to have been a "search," "the police must have physically intruded into 'a constitutionally protected area.' " See 1 LaFave, Search & Seizure § 2.1(a), at 302-03 (2d ed. 1987). Refusing entrance does not intrude into any such area. Similarly, a "seizure" requires that an officer restrict the liberty of an individual such that a reasonable person would not believe that he was free to leave. Id. (citing United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). In Sheppard v. Beerman, 18 F.3d 147 (2d Cir.), cert. denied, 513 U.S. 816, 115 S.Ct. 73, 130 L.Ed.2d 28 (1994), we held that no Fourth Amendment "seizure" took place when a fired court employee was escorted from the courthouse. We reasoned that because the plaintiff was free to go anywhere in the world, except the courthouse, he had not been "seized." Id. at 153. Here, the plan was that motorists who were denied entry for lack of any legitimate reason to go into the area were free to go anywhere else
 
 
 [1]
 Anthony Amsterdam, Perspectives on the Fourth Amendment, 58 Minn.L.Rev. 349 (1974) (criticizing Court decisions holding, in effect, that "whether you and I get arrested and subjected to full-scale body search or are sent upon our respective ways with a pink multiform and a disapproving cluck ... depends upon the state of the digestion of any officer who stops us--or, more likely, upon our obsequiousness, the price of our automobiles, the formality of our dress, the shortness of our hair or the color of our skin.") Id. at 416
 
 
 [2]
 Id
 
 
 [3]
 Reference here should be had to Judge George Pratt's dissent in United States v. Hooper, 935 F.2d 484, 499 (2d Cir.1991)