# United States Court of Appeals
## For the First Circuit

No. 09-2273

WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC.;
CONGREGACIÓN CRISTIANA DE LOS TESTIGOS
DE JEHOVÁ DE PUERTO RICO, INC.,

Plaintiffs, Appellants,

v.

ANTONIO M. SEGARDÍA DE JESÚS, in his official capacity as
Secretary of Justice; LUIS G. FORTUÑO, in his official capacity
as Governor; HÉCTOR MORALES VARGAS, in his official capacity as
Commissioner  of the Planning Board of Puerto Rico; HUMBERTO
MARRERO RECIO, in his official capacity as Administrator of
Regulations and Permits; MUNICIPALITY OF BAYAMÓN; MUNICIPALITY OF
CAGUAS; MUNICIPALITY OF DORADO; MUNICIPALITY OF GURABO;
MUNICIPALITY OF GUAYNABO; MUNICIPALITY OF PONCE; MUNICIPALITY OF
SAN JUAN; MUNICIPALITY OF TRUJILLO ALTO; PACIFICA HOMEOWNERS
ASSOCIATION, INC., d/b/a Pacifica; VILLA PAS, d/b/a/ Villa Paz,
a/k/a Asociación de Residentes de Villa Paz,

Defendants, Appellees.

MUNICIPALITY OF SANTA ISABEL; MUNICIPALITY OF VEGA BAJA;
MUNICIPALITY OF YAUCO; CIUDAD INTERAMERICANA DE BAYAMÓN, INC.,
a/k/a Residentes Urbanización Ciudad Interamericana de Bayamón,
Inc.; CIUDAD INTERAMERICANA, INC., d/b/a Ciudad Interamericana,
a/k/a Asociación de Residentes Ciudad; EL MONTE DE PONCE, P.R.,
INC., d/b/a El Monte, a/k/a Asociación de Residentes de la
Urbanización El Monte de Ponce, P.R., Inc.; ESTANCIAS DE GRAN
VISTA HOMEOWNERS ASSOCIATION, INC., d/b/a Estancias de Gran
Vista; ESTANCIAS DE TORTUGUERO, INC., d/b/a Estancias de
Tortuguero, a/k/a Asociación Residentes Estancias de Tortuguero,
Inc.; ESTANCIAS DE YAUCO, INC., d/b/a Estancias de Yauco, a/k/a
Asociación de Residentes Urbanización Estancias de Yauco, Inc.;
ESTANCIAS DEL TURABO, INC., d/b/a Estancias del Turabo, a/k/a
Asociación de Residentes del Turabo, Inc.; G.H.S. INC., Garden
Hills Sur; BAIROA GOLDEN GATE #2, INC., d/b/a Golden Gage II,
a/k/a Asociación de Residentes de Bairoa Golden Gate #2; HACIENDA
BORINQUEN, INC., d/b/a Hacienda Borinquen, a/k/a Asociación de
Residentes Hacienda Concordia, Inc.; HACIENDA CONCORDIA, INC.,
d/b/a Hacienda Concordia; LOS PRADOS DE DORADO, INC., d/b/a Los

Prados Sur, a/k/a Asociación de Propietarios de la Urbanización Los Prados de Dorado, Inc.; MANSIÓN DEL SUR, INC., d/b/a Mansión del sur, a/k/a Asociación de Propietarios de Mansión del Sur, Inc.; PANORAMA HOMEOWNERS ASSOCIATION, INC., d/b/a Panorama State; PARQUE FORESTAL, INC., d/b/a Parque Forestal, a/k/a Asociación de Propietarios de Parque Forestal, Inc.; PASEO MAYOR HOMEOWNERS ASSOCIATION, INC., d/b/a Paseo Mayor; PRADO ALTO EN TORRIMAR, INC., d/b/a Prado Alto, a/k/a Asociación de Propietarios de Prado Alto en Torrimar, Inc.; SANTA CLARA, INC., d/b/a Santa Clara, a/k/a Consejo de Residentes de Santa Clara, Inc.; UNDARE, INC., d/b/a Santa Maria; VALLES DEL LAGO, INC., d/b/a Valles del Lago, a/k/a Asociación Comunidad Valles del Lago, Inc.; VEREDA DEL RÍO, INC., d/b/a Vereda del Río; DEL TURABO, INC., d/b/a Estancias del Turabo, a/k/a Asociación Comunitaria del Turabo, Inc.,

Defendants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jaime Pieras, Jr., U.S. District Judge]

---

Before
Boudin, Ripple[*] and Selya,
Circuit Judges.

---

Paul D. Polidoro, with whom Gregory Allen, Associate General Counsel, Legal Department, was on brief for appellants.

Daniel M. Gossett, Mayer Brown LLP, Daniel Mach, ACLU Foundation, Program on Freedom of Religion and Belief, William Ramirez, American Civil Liberties Union, Puerto Rico National Chapter, John Reinstein, ACLU of Massachusetts, Zachary L. Heiden, Maine Civil Liberties Union Foundation, and John W. Dineen, Rhode Island Affiliate, ACLU, on brief for the American Civil Liberties Union, the ACLU of Puerto Rico National Chapter, the Maine Civil Liberties Union, the American Civil Liberties Union of Massachusetts, the New Hampshire Civil Liberties Union, and the Rhode Island Affiliate, American Civil Liberties Union, on brief Amici Curiae.

Susan I. Peñagaricano-Brown, Assistant Solicitor General, Department of Justice, with whom Irene S. Soroeta-Kodesh, Solicitor General, Leticia Casalduc-Rabell, Acting Deputy Solicitor General, and Zaira Z. Girón-Anadón, Acting Deputy Solicitor General, were on

---

[*]Of the Seventh Circuit, sitting by designation.

brief for appellees Luis G. Fortuño, in his official capacity as Governor, Antonio Sagardía De Jesús, in his official capacity as Secretary of Justice, Héctor Morales Vargas, in his official capacity as Commissioner of the Planning Board of Puerto Rico, and Humberto Marrero Recio, in his official capacity as Administrator of Regulations and Permits.

Michael C. McCall with whom Eliezer Aldarondo-Ortiz, Claudio Aliff-Ortiz, Simone Cataldi Malpica and Aldarondo & López Bras were on brief for Municipalities.

Luis E. Pabón-Roca, Clarisa Sola Gomez and Faccio & Pabón Roca on brief for the Municipality of Caguas.

Pedro R. Vázquez on brief for appellee Municipality of Gurabo.

Víctor R. Rodríguez, Jean G. Vidal Font and Cancio, Nadal, Rivera & Diaz, P.S.C. on brief for appellee Municipality of Ponce.

Robert Milan and Alejandro Carrasco-Castillo on brief for appellee Municipality of Trujillo Alto.

Carlos R. Rodriguez-Garcia and Rodriguez-Garcia, PSC on brief for appellee Pacifica Homeowner's Association, Inc.

_____

February 7, 2011

_____

**BOUDIN**, **Circuit Judge**.  To abate crime, Puerto Rico adopted a Controlled Access Law, P.R. Laws Ann. tit. 23, §§ 64-64h (2008), allowing local entities (called "urbanizations"), organized by the community but approved by the municipality, to control street access to areas within towns that have voted in favor of such plans.  Appellants are two corporations operated by the Governing Body of Jehovah's Witnesses[1] that challenged in federal district court both the statute and its application.  Apart from default or consent judgments against some of the defendants, the district court denied relief.  The background is as follows.

Jehovah's Witnesses accept a religious duty to share the Bible's message publicly and to proselytize from house to house. Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton, 536 U.S. 150, 160-61 (2002) (discussing Murdock v. Pennsylvania, 319 U.S. 105, 108 (1943)).  They engage in door-to-door ministry, communicate about the Bible with people on public streets, and offer religious literature to anyone interested in reading it. They say that their activities in Puerto Rico have been constrained by urbanizations acting pursuant to the Controlled Access Law that is the subject of this appeal.

---

[1]Watchtower Bible and Tract Society of New York, Inc. coordinates the preaching activities of Jehovah's Witnesses throughout the United States and publishes widely distributed religious literature.  Congregación Cristiana de los Testigos de Jehová de Puerto Rico, Inc. oversees the 318 congregations of Jehovah's Witnesses in Puerto Rico, which have about 25,000 members.

The Controlled Access Law--adopted in 1987 and amended in 1988, 1992, 1997, and 1998--was prompted by and adopted against a background of endemic violent crime. Puerto Rico, with a median household income only about one-third of the U.S. national average and less than half of every other state, has a homicide rate quadruple the U.S. national rate and more than double that of virtually every state.[2] It is a major drug transit point, and drug dealing has led in a number of cases to corruption among local police.[3]

The statute, as currently amended, authorizes municipalities to grant permits to neighborhood homeowners' associations called urbanizations to control vehicular and pedestrian access to the public residential streets within the urbanization (the term referring either to the association or to the controlled area). In such cases, the area is enclosed with fencing or other barriers and with one or more entry and exit gates for pedestrians and vehicles. P.R. Laws Ann. tit. 23, § 64. Some of the gates are manned by security guards paid by the association;

_____

[2]U.S. Census Bureau, Median Household Income for States 4 (Sept. 2009), http://www.census.gov/prod/2009pubs/acsbr08-2.pdf; Fed. Bureau of Investigation, U.S. Dep't of Justice, Crime in the United States, 2009 at tbl.4 (2010), available at http://www2.fbi.gov/ucr/cius2009/data/table_04.html.

[3]Nat'l Drug Intelligence Ctr., U.S. Dep't of Justice, Puerto Rico/U.S. Virgin Islands High Intensity Drug Trafficking Area Drug Market Analysis 2, 8 (2009), available at http://www.justice.gov/ndic/pubs32/32788/32788p.pdf.

others are unmanned and opened by a key or by an electric signal operated by a buzzer linked to the residences within the urbanization.

In some respects, the controlled access regime is a counterpart to the private "gated" residential communities that have developed elsewhere; but in Puerto Rico the streets within the area were and remain public property, and the municipality is closely involved in authorizing the urbanization. To obtain a permit, the residential community must create a residents' association; propose a plan describing the permanent barriers and access arrangements; file a petition supported by at least three-quarters of the residential homeowners; and assume the costs of installing and operating the plan. P.R. Laws Ann. tit. 23, § 64a.

The statute has various provisions directed to assuring access, P.R. Laws Ann. tit. 23, §§ 64, 64c, 64g, but the most important provision here specifies that the controlled access plan "shall not prevent or hinder residents from outside the community to use and enjoy sports, recreational and other community installations, nor from obtaining the services of private institutions such as schools, churches, hospitals, civic clubs and others, located in the community," id. § 64b(e). Although the Commonwealth superintends the permit process,[4] each municipality

---

[4]The Puerto Rico Planning Board issues rules for granting controlled access permits, P.R. Laws Ann. tit. 23, §§ 64, 64e, and the Commonwealth Administration of Regulation and Permits

-6-

after a public hearing makes the decision whether to approve a permit application, id. § 64b.

The Puerto Rico Supreme Court has upheld the constitutionality of the Controlled Access Law, Asociación Pro Control de Acceso Calle Maracaibo, Inc. v. Cardona-Rodriquez (Maracaibo), 144 D.P.R. 1 (1997), stressing that the enclosed areas remain public property, id. at 28-29, 32, and that "if any regulation approved by any [urbanization] violates constitutionally protected rights, the same will be considered null and void," id. at 27-28. Administration of an approved regime is left to the individual municipality and urbanization. Id. at 26.

Dozens of municipalities have issued permits to hundreds of urbanizations that encompass in total tens of thousands of residences. According to the Jehovah's Witnesses' unrebutted data, urbanizations range in size from a dozen residences to 300 or so, but the average urbanization encompasses about 125 residences, which may be houses, apartments, or a mixture of both. The data is not definitive, but it appears as if about half employ guards and the balance--likely the smaller ones--are accessible only by keys or buzzers.

The Jehovah's Witnesses have claimed from the outset that they have often been prevented from entering urbanizations to

_____

administers the Board's permitting regulations but does not direct the municipalities or urbanizations in their implementation of permits.

engage in constitutionally protected activity, including door-to-door religious proselytizing. Some controlled access areas, they say, can be entered only through unmanned, locked gates, and residents may choose not to admit visitors; others have security guards who deny entry to proselytizers or who reject all visitors unless a resident or the association grants them specific approval. In still others, it is claimed that guards intermittently deny access to Jehovah's Witnesses.

The Jehovah's Witnesses say that they made various efforts to achieve some accommodation but without success. On May 18, 2004, appellants brought suit in federal district court in Puerto Rico seeking declaratory and injunctive relief under 42 U.S.C. § 1983 (2006) against the Governor and three other Commonwealth-level officials. They alleged that the Controlled Access Law, facially and as applied, abridged their right to be secure from unreasonable seizures and their rights to the freedoms of speech, press, association, religion, and travel.

On August 9, 2005, the district court dismissed the facial constitutional challenges to the Controlled Access Law but declined to dismiss the as-applied challenges. Watchtower Bible & Tract Soc'y of N.Y. v. Sanchez Ramos, 389 F. Supp. 2d 171, 188-89 (D.P.R. 2005). Thereafter the court required the appellants to include as defendants municipalities and urbanizations that would be affected by relief. After a survey, the Jehovah's Witnesses

reported that of the 770 controlled-access areas in 59 municipalities covering 96,884 residences, they were unable to access freely 587 urbanizations in 57 municipalities covering 67,095 residences, either because a security guard denied them access to a manned gate or because they did not have means to enter an unmanned gate.

An amended complaint then added as representative defendants eleven of the municipalities and twenty-two of the urbanizations and also alleged equal protection and due process claims. In 2008, eight urbanization defendants agreed to grant Jehovah's Witnesses "unfettered access," and the district court entered default judgment against three municipalities and twelve urbanizations, ordering them to grant Jehovah's Witnesses unfettered access. Appellants allege that Jehovah's Witnesses remain unable to gain access to the three defaulting municipalities and to nine of the defaulting urbanizations.

On August 10, 2009, the district court granted the remaining defendants' motions for summary judgment, dismissing the complaint with prejudice and awarding the defendants attorneys' fees. Watchtower Bible Tract Soc'y of N.Y., Inc. v. Sánchez-Ramos, 647 F. Supp. 2d 103, 125-26 (D.P.R. 2009). The court agreed that some urbanizations have security guards who deny access to Jehovah's Witnesses absent permission of an urbanization resident, id. at 113, 118, and that some have locked gates, which Jehovah's

Witnesses are unable to enter without a resident's permission, id. at 118 & n.11. But the court concluded that these plans were acceptable because they all allowed Jehovah's Witnesses to enter if they coordinated entry with an urbanization resident. Id. at 118-19.

The Jehovah's Witnesses now appeal from the district court orders refusing declaratory and injunctive relief and awarding attorneys' fees to the defendants. They say that the statute is facially unconstitutional but, if not, that they were entitled to injunctive relief to address "as-applied" restrictions on access. The primary challenges pressed on appeal are based upon the First and Fourth Amendments; but other issues are also before us including the district court's grant of attorneys' fees to the defendants.

Threshold Issues. At the outset, various of the defending municipalities or urbanizations offer threshold or related objections to the lawsuit, all of which are without merit and most of which require little discussion. Several challenge the standing of the plaintiff organizations to represent the interests of their Jehovah's Witnesses' members, but the appellants patently satisfy the usual tests for association standing: the members have standing; the interests at stake are germane to the organization's purposes; and participation of individual members is not necessary

to the suit.  <u>Hunt</u> v. <u>Wash. State Apple Adver. Comm'n</u>, 432 U.S. 333, 343 (1977).

Some municipalities and urbanizations say that claims against them are moot because they have already been ordered to grant "unfettered access" to Jehovah's Witnesses.  But this at best can mean that Jehovah's Witnesses are granted access if they identify themselves and state their purpose; and among the claims pressed by appellants are colorable contentions that the underlying statute is unconstitutional, that the permits granted to urbanizations are all unlawful, and that no one is entitled to ask them any questions at all.  Right or wrong, claims of this breadth can hardly be moot.

Some appellees say that the appellants' claims are premature and others say that the claims are belated, being barred by laches or by the statutes of limitations; some also say that the claims are barred by the requirements imposed by <u>Monell</u> v. <u>Department of Social Services</u>, 436 U.S. 658 (1978), on liability for municipalities or barred by state-action doctrine.  The prematurity defense rings hollow: the appellees apart from the Commonwealth are municipalities and urbanizations where access regimes have allegedly been put in place; the record contains colorable claims that various Jehovah's Witnesses have been denied access by defendants; and, where the challenge is to the existence of the regime itself, it can hardly be premature.

-11-

Considering next the laches objection, nothing indicates that the appellants slept on their rights to the prejudice of the appellees. Vaquería Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 480 (1st Cir. 2009). The appellants seemingly made extensive efforts to resolve the dispute through legislative, administrative, and judicial avenues; they eventually secured consent or default judgments against some of the defendants and say that most of these have not been honored. Nor have appellees shown injury or prejudice from any delay.

The statute of limitations defense is not properly before us. This appeal is from a blanket decision that bars declaratory and injunctive relief by holding the access regime constitutional as against facial and as-applied challenges. If it is later determined in light of this decision that unconstitutional actions have occurred, there will be the time enough to consider defenses relevant to damages--if particularized damages are ever sought.

As for municipal liability under Monell, any bar to damage claims is beside the point because damages have not been sought. Although the Supreme Court recently held that even plaintiffs who seek only prospective relief under section 1983 must satisfy Monell's "policy" or "custom" requirement, L.A. Cnty. v. Humphries, 131 S. Ct. 447, 453-54 (2010), the appellants plainly allege that their injuries result from the municipalities' policies or customs. Authorization of controlled access is on its face an

implementation of municipal policy.  See Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986).[5]

Monell aside, some of the municipal appellees seek to shift responsibility to the urbanizations, who in turn say that they are private actors immune from the limits imposed on governments by the First and Fourth Amendments.  But the municipal permits constitute state action.  As for the urbanizations, Burton v. Wilmington Parking Authority, 365 U.S. 715 (1961), and other decisions hold "that actions of private entities can sometimes be regarded as governmental action for constitutional purposes." Lebron v. Nat'l R.R. Passenger Corp., 513 U.S. 374, 378 (1995).

The case law in this circuit, consistent with Supreme Court precedent, is that the "state actor" label can apply where the nominally private actor is performing an inherently public function, where the nominally private conduct is inextricably entangled with official public action, or where the nominally private conduct is compelled by state law or state actors.[6]  Here,

---

[5]Whether under Humphries ultimate injunctive relief as to as-applied challenges could run against the municipalities as well as the urbanizations--for example, on a delegated authority theory, Pembaur, 475 U.S. at 481-84--need hardly be determined now.

[6]Sanchez v. Pereira-Castillo, 590 F.3d 31, 51-52 (1st Cir. 2009); Alberto San, Inc. v. Consejo de Titulares del Condominio San Alberto, 522 F.3d 1, 4 (1st Cir. 2008); Estades-Negroni v. CPC Hosp. San Juan Capestrano, 412 F.3d 1, 4-5 (1st Cir. 2005); see also Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 302 (2001) (entanglement); West v. Atkins, 487 U.S. 42, 56 (1988) (public function); Adickes v. S.H. Kress & Co., 398 U.S. 144, 170 (1970) (compulsion).

we need go no further than the public function test, which is primarily based on history, see S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm., 483 U.S. 522, 545 (1987), although other factors are sometimes in the equation, Brentwood Acad., 531 U.S. at 295.

The Puerto Rico Supreme Court has ruled that the public streets within the urbanization remain public property despite their enclosure.[7] Regulating access to and controlling behavior on public streets and property is a classic government function. Marsh v. Alabama, 326 U.S. 501, 506-09 (1946) (access to streets in company town); see also Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 163 (1978) (police protection); Evans v. Newton, 382 U.S. 296, 301-02 (1966) (park management). Thus, under governing precedent, the regulation of access to the public streets is a public function.

The constitutional claims. Turning to the merits, we begin with the First Amendment, which is binding in Puerto Rico. Ramírez v. Sánchez Ramos, 438 F.3d 92, 94 n.1 (1st Cir. 2006). In general, our review of claims in the present procedural setting is de novo. Rectrix Aerodrome Ctrs., Inc. v. Barnstable Mun. Airport

---

[7]Maracaibo, 144 D.P.R. at 28 ("[T]he permit that the municipality grants must be interpreted and enforced according to the public nature of those roads." (quoting Caquías v. Asociación de Residentes de Mansiones de Río Piedras, 134 D.P.R. 181, 207-08 (1993))); id. at 29 ("In this context, the streets are goods of public use and domain irrespective of the jurisdiction under which they may be, whether municipal or state."); id. at 32 ("[T]he concept of access control implies that the public nature of residential streets is preserved." (quoting Caquías, 134 D.P.R. at 186)).

Comm'n, 610 F.3d 8, 11 (1st Cir. 2010). The facial and as-applied challenges present different issues--the former is more far-reaching--but certain of the constitutional principles and precedents are common to both and with them we begin.

Access to public streets and property for purposes of expression, including door-to-door religious proselytizing, has long been protected by the First Amendment. Vill. of Stratton, 536 U.S. at 160-62; see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 44 (1983).[8] But virtually every constitutional principle or protection, including the First Amendment, is limited by others, Vill. of Stratton, 536 U.S. at 162; Hynes v. Mayor of Oradell, 425 U.S. 610, 616-17 (1976), and a balancing of competing rights and interests is generally inherent, Globe Newspaper Co. v. Beacon Hill Architectural Comm'n, 100 F.3d 175, 182 (1st Cir. 1996); see also Denver Area Educ. Telecomm. Consortium, Inc. v. FCC, 518 U.S. 727, 740-41 (1996) (plurality opinion).

Public streets and sidewalks are presumptively traditional public forums, New Eng. Reg'l Council of Carpenters v. Kinton, 284 F.3d 9, 20 (1st Cir. 2002), and the Supreme Court has

---

[8]While freedom of speech is the paradigm interest asserted, appellants invoke as well freedom of press, religion, association, and travel. We do not see how our analysis would be altered by stressing that the speech is for religious purposes, sometimes through the press, and that travel is the means by which the proselytizing occurs.

repeatedly reaffirmed their status as places for expressive activity, e.g., Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez, 130 S. Ct. 2971, 2986 n.14 (2010).  The public streets and sidewalks within the urbanizations remain public property for public use, see Maracaibo, 144 D.P.R. at 28-29, 32, and so are traditional public forums.

The case would be different if the Commonwealth sought to alter the physical character, principal uses, or public ownership of the streets within the urbanizations to negate their status as public forums.  The government can dispose of its property, see Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 699-700 (1992) (Kennedy, J., concurring in judgment); Hawkins v. City of Denver, 170 F.3d 1281, 1287 (10th Cir.), cert. denied, 528 U.S. 871 (1999), although just how is an open question, see United States v. Grace, 461 U.S. 171, 179-80 (1983); U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 133 (1981).  But the question does not arise here.

However, even in traditional public forums circumstances may justify restrictions.[9]  In public forums, viewpoint-based restrictions are prohibited, and any content-based restriction must satisfy strict scrutiny, but reasonable time, place, and manner

---

[9]E.g., Hill v. Colorado, 530 U.S. 703 (2000) (picketing of abortion clinic); Burson v. Freeman, 504 U.S. 191 (1992) (electioneering activity near polling place); Frisby v. Schultz, 487 U.S. 474 (1988) (picketing of individual residence).

-16-

limitations are permissible, <u>Pleasant Grove City</u> v. <u>Summum</u>, 129 S. Ct. 1125, 1132 (2009), that is, those "justified without reference to the content of the regulated speech," "narrowly tailored to serve a significant governmental interest," and "leav[ing] open ample alternative channels for communication of the information," <u>Ward</u> v. <u>Rock Against Racism</u>, 491 U.S. 781, 791 (1989) (quoting <u>Clark</u> v. <u>Cmty. for Creative Non-Violence</u>, 468 U.S. 288, 293 (1984)). Judicial review invites "intermediate scrutiny" by the reviewing court. <u>Bl(a)ck Tea Soc'y</u> v. <u>City of Boston</u>, 378 F.3d 8, 12 (1st Cir. 2004).

Admittedly, the limited access regime is not confined to those who propose to speak; and in some cases, such as a general tax that happens to affect newspapers, nothing beyond due process rationality is required, <u>see</u> <u>Minneapolis Star & Tribune Co.</u> v. <u>Minn. Comm'r of Revenue</u>, 460 U.S. 575, 581 (1983). But here the blanket restriction on unapproved entry has a foreseeable, significant, and direct impact on public speech in the urbanization; and the lens of the public forum doctrine is appropriate.

> Public forum doctrine recognizes that, by denying speakers access to those areas in which potential listeners are most likely to concentrate, even a law not directed at speech can amount to an infringement of the right to free speech . . . .

Dorf, <u>Incidental Burdens on Fundamental Rights</u>, 109 Harv. L. Rev. 1175, 1208-09 (1996).

-17-

So, while the purpose of the regime is relevant, intermediate scrutiny remains appropriate--but only intermediate scrutiny, for no one claims that the statute aims at suppressing content. Nor do the Jehovah's Witnesses deny that crime control is a serious governmental interest; a "primary concern" of government is "a concern for the safety and indeed the lives of its citizens," United States v. Salerno, 481 U.S. 739, 755 (1987).[10] However, the Jehovah's Witnesses and amicus ACLU say that the regime does not serve this interest, asserting that crime rates have increased since the statute's adoption.

The question is whether the legislature could reasonably deem the access control measure effective and more so than other, less intrusive alternatives. See Vill. of Stratton, 536 U.S. at 169; id. at 170-71 (Breyer, J., concurring). Indisputably, the Puerto Rico legislature supposed that such a regime would help protect residential neighborhoods. See 1987 P.R. Laws 63 (Act No. 21 Statement of Motives); see also Maracaibo, 144 D.P.R. at 28, 37 (discussing the Controlled Access Law's purpose). We cannot deem that view unreasonable, for it is easy to suppose that some

---

[10]The crime control rationale makes this case different from many traditional public forum cases in which public safety was not seriously in issue or was not a plausible rationale. E.g., Vill. of Stratton, 536 U.S. at 169; id. at 170-71 (Breyer, J., concurring); Grace, 461 U.S. at 182; Martin v. City of Struthers, 319 U.S. 141, 144-47 (1943); Schneider v. State (Town of Irvington), 308 U.S. 147, 162 (1939); Lovell v. City of Griffin, 303 U.S. 444, 451 (1938).

-18-

criminals would be deterred by the need to pass by guards who can ask questions and remember faces.[11]

Accordingly, we agree with the district court that the statute is not unconstitutional on its face. Such a challenge ordinarily requires that the statute be invalid in every possible application or, in some First Amendment contexts, that it be clearly overbroad in some applications that cannot or should not be severed. Members of the City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 796 (1984); McGuire v. Reilly, 260 F.3d 36, 47 (1st Cir. 2001). "Some applications" refers to applications embedded in the statute.

Here, the statute explicitly confirms that innocent visits are permitted, P.R. Laws Ann. tit. 23, §§ 64b(e), 64c, and it has been so interpreted by the Puerto Rico Supreme Court, Maracaibo, 144 D.P.R. at 38 & n.14. Nothing in the statute endorses the principal inhibitions of which appellants complain. The statute says nothing of unmanned locked gates or buzzers controlled solely by residents, nor does it empower guards to deny access unless a resident approves. At various points--although not on this appeal--the Jehovah's Witnesses indicated that they would

---

[11]Cf. De la O v. Hous. Auth. of El Paso, 417 F.3d 495, 504 (5th Cir.), cert. denied, 546 U.S. 1062 (2005) (upholding restriction on access to public housing project for crime-control reasons); Daniel v. City of Tampa, 38 F.3d 546, 550 (11th Cir. 1994), cert. denied, 515 U.S. 1132 (1995) (same).

be content if the statute itself were fairly administered to provide them with effective access.

Nevertheless, the record indicates that the regime as administered does bear unreasonably on Jehovah's Witnesses' access to public streets, and to that subject we now turn. "Security is not a talisman that the government may invoke to justify any burden on speech (no matter how oppressive)." Bl(a)ck Tea Soc'y, 378 F.3d at 13 (emphasis omitted). Narrow tailoring, which forbids burdening substantially more speech than necessary, Asociación de Educación Privada de P.R., Inc. v. García-Padilla, 490 F.3d 1, 16 (1st Cir. 2007), may require reasonable tempering at the application stage.

The first problem is the use in some urbanizations of exclusively a key or buzzer system that gives residents a veto right over access. A regime of locked, unmanned gates completely barring access to public streets will preclude all direct communicative activity by non-residents in traditional public forums, and, absent a more specific showing, cannot be deemed "narrowly tailored." Thus, a manned guard gate for each urbanization is required, unless the urbanization carries a burden of special justification.

Conceivably, a controlled access area might be very small, its residents' resources very limited, or both: some urbanizations have as few as one or two dozen residences. The

-20-

district court will have to determine whether and when it is reasonable to rely only on a buzzer system or some limited guard access (say, for a few hours a day on predesignated days each week). Finding such accommodations is best done with help from the parties, but the district court can certainly set general standards and categories without area by area adjudications.

As the statute places no restriction on the size of an urbanization, the presumption--even if rebuttable--is in favor of some access, cf. Frisby, 487 U.S. at 486 (generally directed expression "may not be completely banned in [public] residential areas"); Perry Educ. Ass'n, 460 U.S. at 45 (in traditional public forums "the government may not prohibit all communicative activity"). And, in proposals for exemption or very limited access, the urbanization proposing the limitation should come forward with a proposal and bear the burden of justification.

As for guarded gates, the Jehovah's Witnesses say that some deny access to all Jehovah's Witnesses--or anyone else not approved by a local resident; others (allegedly) admit or deny access at the guards' whim. In our view, a security guard may ask a non-resident visitor where the visitor is headed and also to state the purpose of the visit. And, although a closer question, we think that the Constitution permits a guard to ask a visitor for his or her name and identification--a question often asked at the entrance of public federal buildings like courthouses, United

States v. Smith, 426 F.3d 567, 570, 574-75 (2d Cir. 2005), cert. denied, 546 U.S. 1204 (2006).[12]

True, an automatic request for the visitor's name poses a close question, given case law recognizing a right of anonymous speech.[13] But the cases are distinguishable: giving a guard a name and identification is a narrower and less threatening imposition on privacy than requiring one to register for a permit, to wear an identification badge in distributing literature, or to disclose membership information. And the request is more closely related to the security rationale than the weaker purposes that lay behind the obligations that the Supreme Court disallowed.

Still, the safer course would be to ask for names and identification only where cause exists. If a guard does have a reasonable suspicion (based on objective circumstances) that a non-resident visitor may engage in criminal activity, the guard may insist on answers to more intrusive questions as a condition of access or may withhold access while calling the police to

_____

[12]The Puerto Rico Supreme Court may have disallowed name and identification requests save in a more limited class of cases, Maracaibo, 144 D.P.R. at 38, although presumably not where the guard has a reasonable suspicion. To the extent that the Puerto Rico Supreme Court's determination rests on local law, we have no authority to immunize urbanizations.

[13]See, e.g., Vill. of Stratton, 536 U.S. at 166-67; Buckley v. Am. Constitutional Law Found., Inc., 525 U.S. 182, 197-204 (1999); McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 341-47 (1995); Talley v. California, 362 U.S. 60, 62-65 (1960); Bates v. City of Little Rock, 361 U.S. 516, 522-25 (1960); NAACP v. Alabama, 357 U.S. 449, 460-63 (1958).

investigate. Objective circumstances also serve to ensure that any restriction on access is sufficiently cabined so that guards do not exercise undue discretion. See Thomas v. Chi. Park Dist., 534 U.S. 316, 323 (2002).

Such limited questions do not violate the Jehovah's Witnesses' rights of free speech, including anonymous or spontaneous speech. The narrow tailoring rule is that a time-place-manner restriction may not burden substantially more than necessary to serve its purpose, not that it may not burden speech at all. Asociación de Educación Privada, 490 F.3d at 16 (citing Ward, 491 U.S. at 800). By contrast to the regime disallowed in Village of Stratton, here no registration is imposed and significant delay will occur only where there is a fact-specific basis for it.

Turning now to the Jehovah's Witnesses' Fourth Amendment challenge, they say that they are subject to an unlawful "seizure" when they are brought to a halt at access points set up around the enclosures. The Fourth Amendment applies to Puerto Rico through the Fourteenth Amendment. Maldonado v. Fontanes, 568 F.3d 263, 270 n.2 (1st Cir. 2009). As already explained, the use of nominally private guards does not avoid the issue because the urbanizations and their guards qualify as state actors under the public function test. See also Romanski v. Detroit Entm't, LLC, 428 F.3d 629, 636-

38 (6th Cir. 2005), cert. denied, 549 U.S. 946 (2006) (applying the public function test to private guards).

In ordinary usage, no seizure occurs at the barrier; one denied access to a government building, for example, can hardly claim to be "seized."  See Sheppard v. Beerman, 18 F.3d 147, 153 (2d Cir.), cert. denied, 513 U.S. 816 (1994) (excluded visitor not "seized" where "'free to go anywhere else that he desired,' with the exception of [the judge's] chambers and the court house").  The Jehovah's Witnesses, in response, rely mainly on cases involving police roadblocks of vehicles, but these cases say or assume that detention--at least temporary detention--is the design or effect.

Often a roadblock is aimed directly at arresting violators in the vehicle, and--even without this motive--the usual roadblock effects an intentional detention or "seizure" of the vehicle and those within it.[14]  No one thus halted imagines himself free merely to turn and drive away without permission.  As Delaware v. Prouse, 440 U.S. 648 (1979), explained, "[t]he Fourth and Fourteenth Amendments are implicated in this case because stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of those Amendments, even though the purpose of

---

[14]E.g., City of Indianapolis v. Edmond, 531 U.S. 32 (2000) (roadblock to detect drug trafficking); Mich. Dep't of State Police v. Sitz, 496 U.S. 444 (1990) (roadblock to detect drunk driving); United States v. Martinez-Fuerte, 428 U.S. 543, 556 (1976) (roadblock to detect unlawful immigration); see also Illinois v. Lidster, 540 U.S. 419 (2004) (roadblock to seek information about hit-and-run crime).

the stop is limited and the resulting detention quite brief." Id. at 653. In other cases, the premise is implicit.[15]

By contrast, a Jehovah's Witness halted at an urbanization barrier need not answer questions or remain at the barrier; anyone so questioned is free to walk or to drive away. As long as a reasonable person would feel free to leave or, if not desiring to leave, would feel free to terminate the encounter, no Fourth Amendment seizure has occurred. Brendlin v. California, 551 U.S. 249, 255 (2007). This is so even if refusal to answer questions precludes entry into the urbanization. In a different context, United States v. Mendenhall, 446 U.S. 544 (1980), Justice Stewart stated:

> As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.

Id. at 554 (principal opinion).[16]

---

[15]E.g., Lidster, 540 U.S. at 422, 425 (information-seeking roadblock deemed a compelled stop of each vehicle followed by a detention of its occupants for brief questioning); Edmond, 531 U.S. at 35 (drug-interdiction roadblock described as compelling an involuntary stop followed by an open-view examination and detention for five minutes or less); Sitz, 496 U.S. at 447 (sobriety roadblock called an involuntary stop followed by a brief detention and examination for signs of intoxication).

[16]See United States v. Faulkner, 450 F.3d 466, 469-70 (9th Cir. 2006) (information-station roadblock at a national park entrance involved a seizure because a reasonable person would have believed that he was not free to leave the information station); Maxwell v. City of New York, 102 F.3d 664, 668 n.2 (2d Cir. 1996), cert.

Pertinently, see California v. Hodari D., 499 U.S. 621, 626 & n.2 (1991), at common law an arrest required confinement (actual or constructive), and merely "preventing another from going in a particular direction" would not itself qualify. Restatement (Second) of Torts § 36(3) (1965) (discussing false imprisonment, a common law tort for unlawful arrest); see Perkins, The Law of Arrest, 25 Iowa L. Rev. 201, 203 (1940). After police officers enclosed and blocked a footpath, a trespass action for unlawful detention failed, the court holding that no confinement occurs when "one man merely obstructs the passage of another in a particular direction . . . leaving him at liberty to stay where he is or to go in any other direction if he pleases." Bird v. Jones, (1845) 115 Eng. Rep. 668, 672; 7 Q.B. 742, 751-52 (Patteson, J.).

Yet even were a court to treat the urbanization barrier as a seizure, "'the ultimate touchstone of the Fourth Amendment,' [the Supreme Court has] often said, 'is reasonableness,'" Michigan v. Fisher, 130 S.Ct. 546, 548 (2009) (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)) (internal quotation marks omitted). "[N]either a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable

denied, 522 U.S. 813 (1997) (in sustaining a neighborhood-safety checkpoint, observing that "simply turning away a vehicle when no legitimate reason for entry is given may not constitute a search or a seizure for Fourth Amendment purposes"). But see Mills v. District of Columbia, 571 F.3d 1304, 1308 (D.C. Cir. 2009) (assuming without discussion that a neighborhood-safety checkpoint was a seizure).

component of reasonableness in <u>every</u> circumstance." <u>Nat'l Treasury Emps. Union</u> v. <u>Von Raab</u>, 489 U.S. 656, 665 (1989) (emphasis added).

Where the aim is other than detecting evidence of ordinary criminal wrongdoing to apprehend violators, <u>see</u> <u>Lidster</u>, 540 U.S. at 423, the Court weighs "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty."[17] The Court has upheld vehicular roadblocks and brief inquiries of all drivers, without individual probable cause or suspicion, for certain purposes and with certain safeguards. <u>United States</u> v. <u>William</u>, 603 F.3d 66, 68 (1st Cir. 2010).

Here, the purpose is to protect communities endangered by crime; but the means--the barriers--are designed not to secure the arrest of would-be criminals but merely to ask entrants to explain their purpose, and the "seizure" (if one is assumed to be occurring) involves no "detention" because the would-be entrant is not held or searched but remains free to leave. <u>Cf.</u> <u>United States</u> v. <u>Fraire</u>, 575 F.3d 929, 933 (9th Cir. 2009) (upholding checkpoint at national park entrance to deter poachers because "[t]he goal was prevention, not arrests").

---

[17]<u>Brown</u> v. <u>Texas</u>, 443 U.S. 47, 51 (1979); <u>see also</u> <u>Lidster</u>, 540 U.S. at 427-28 (balancing these factors); <u>Sitz</u>, 496 U.S. at 450-55 (same); <u>Martinez-Fuerte</u>, 428 U.S. at 556-64 (same).

There is a long history of general area-entry searches. See generally 5 W. LaFave, Search and Seizure §§ 10.6-10.7, at 278-331 (4th ed. 2004). Especially pertinent is language in Chandler v. Miller, 520 U.S. 305 (1997), where the Supreme Court, although invalidating Georgia's requirement that candidates for state office pass drug tests, reiterated that

> where the risk to public safety is substantial and real, blanket suspicionless searches calibrated to the risk may rank as "reasonable"--for example, searches now routine at airports and at entrances to courts and other official buildings.

Id. at 323. Compared to an airport search, a few questions about identity and purpose for entering an urbanization seem tame indeed.

In sum, the case before us is novel and difficult. But Puerto Rico's crime problems are unusually serious and its legislature's solution, albeit an experiment, was democratically adopted and is far from irrational. A court's task is to assure breathing room for legitimate communicative activity. Although we reject the facial challenge to the statute, the precedents on access to public places require fine tuning of the statute's local administration and, for that, further proceedings are required.

On remand the district court needs to take prompt action to bring the municipalities and urbanizations into compliance with this decision. In the case of urbanizations that already provide regularly manned guard gates, they must provide entry to Jehovah's Witnesses who disclose their purpose and identity, subject only to

-28-

the limitations already set forth above.  It is unclear why it should take any substantial time in such cases to give the necessary instruction or what excuse could be given for failing to make a good faith effort at prompt implementation.

Where an urbanization currently provides access only through a locked gate or a buzzer operated solely by residents, adjustment may take longer.  Those prepared to provide guards during daylight hours need a brief period to hire and to train them.  And any urbanization that seeks to justify more limited access arrangements (for example, manned gates for limited periods on designated days) or an exemption because of small size needs a chance to propose and defend such a request.  The district court can adopt categorical guidelines and make use of magistrate judges or other facilitators as needed.

To assure compliance might seem a daunting task because of the number of urbanizations, but we would expect the district court--if confronted with undue delay or repeated noncompliance-- promptly to direct open access for all visitors unless and until the urbanization brings itself into compliance.  Further, unreasonable delay creates a risk of contempt and of damages and attorneys' fees, 42 U.S.C. § 1988(b); see Boston's Children First v. City of Boston, 395 F.3d 10, 14 (1st Cir. 2005), providing an additional incentive for defendants to act promptly.

Accordingly, we _affirm_ the district court's dismissal of the facial challenge to the Controlled Access Law but _vacate_ the district court order denying declaratory and injunctive relief on the as-applied claims; we also _vacate_ the order granting attorneys' fees and costs against the Jehovah's Witnesses because its premise is undermined by our decision; and we _remand_ the case for further proceedings consistent with this decision. Each side has obtained something from this appeal and each shall bear its own costs.

_It is so ordered_.