**UNITED STATES of America,**
**Plaintiff,**

v.

**Carmelo R. GONZÁLEZ–ROMÁN, Defendant.**

**Criminal No. 15–cr–00063 (JAF).**

United States District Court,
D. Puerto Rico.

Signed July 21, 2015.

---

Nicholas Warren Cannon, United States Attorney's Office, San Juan, PR, for Plaintiff.

Yasmin A. Irizarry, Eric A. Vos, Federal Public Defender's Office, Hato Rey, PR, for Defendant.

### MEMORANDUM IN SUPPORT OF VARIANCE

JOSE ANTONIO FUSTE, District Judge.

## I.

### Introduction

It is undeniable that violent crime is rampant in Puerto Rico. *See Watchtower*

*Bible and Tract Society of New York, Inc. v. Sagardia De Jesus*, 634 F.3d 3 (1st Cir.2011) ("*Watchtower I*"). In *Watchtower I*, the First Circuit examined the constitutionality of Puerto Rico's Controlled Access Law, which allowed neighborhoods to close off access to public streets. *Id.* The Court recognized that "[t]he Controlled Access Law [ ] was prompted by and adopted against a background of endemic violent crime." *Id.* at 6. "Puerto Rico, with a median household income only about one-third of the U.S. national average and less than half of every other state, has a homicide rate quadruple the U.S. national rate and more than double that of virtually every state." *Id.* "It is a major drug transit point, and drug dealing has led in a number of cases to corruption among local police." *Id.* Along with drug trafficking comes drug-related violence, including the transportation, possession, and use of illegal firearms.

Puerto Rico's violent crime rate has been witnessed first-hand by the Article III judges when they visit the island. The security measures taken to protect the judges during their visits are neither secret, nor overemphasized. Article III judges live here under the same cloud of concern. Simply, the measures taken to protect the federal judges in Puerto Rico are necessities for the protection of the judicial system as a whole. Typically, in large cities you can find a "safe" area of town, where law enforcement escorts would not be necessary. In Puerto Rico, no place is "safe"; housing projects sit alongside luxury homes, the shoreline is shared by all walks of life, and there is a constant need to watch one's back.

Even a person's home or car is not a safe place in Puerto Rico. According to the 2013 data from the Federal Bureau of Investigation,[1] 9,328 incidents of violent crime occurred that year in Puerto Rico. This is a rate of 258 violent crimes per 100,000 inhabitants. Of these violent crimes, 883 were for murder or violent manslaughter,[2] which equates to 24.4 per 100,000 inhabitants.[3] This is more than *quintuple* the United States murder rate of 4.5 per 100,000 inhabitants.[4] In fact,

1. The most recent FBI data published online for Puerto Rico is from the year 2013. *See* FED. BUREAU OF INVESTIGATION, UNIFORM CRIME REPORTS, https://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s (last visited Jul. 17, 2015).

2. We who manage the federal justice system in Puerto Rico know that the reality is worse than the statistics appear. The volume of cases in state court and the irregular local plea practice supervised by term judges, many times end up converting, reducing, or reclassifying murders or other crimes without any kind of explanation. It is an awful routine. Murder cases are reclassified by judges to manslaughter without legal justification and many times without a single word of explanation. This unfortunate cultural legal routine only demeans the credibility of the system. The local prosecutors and defense counsel consent or are powerless to protest. It is a culture of closing cases, many of which get illegal, unsupported, unwarranted reductions from murder to manslaughter and on many occasions the penalties imposed are not in keeping with the seriousness of the crimes. This applies also to crimes against property and to violations of Puerto Rico's strict firearms laws. It is not uncommon to see probation sentences of over ten or fifteen years for cases that indeed were murder cases or serious firearms cases.

3. FED. BUREAU OF INVESTIGATION, CRIME IN THE UNITED STATES BY STATE, 2013, https://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/tables/5tabledatadecpdf/table_5_crime_in_the_united_states_by_state_2013.xls (last visited Jul. 17, 2015).

4. FED. BUREAU OF INVESTIGATION, CRIME IN THE UNITED STATES BY VOLUME AND RATE PER 100,000 INHABITANTS, 1994–2013, https://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.2013/tables/1tabledatadecoverviewpdf/table_1_crime_in_the_united_states_

this murder rate is more on par with countries like Mexico, and the Dominican Republic than the general United States.[5] In 2012, the World Bank ranked Puerto Rico as having the fourteenth highest murder rate in the world with twenty-seven intentional homicides per 100,000 people, a rate higher than the Dominican Republic and Mexico, whose murder rates are both twenty-two per 100,000 people.[6] In 2013, there were 6,106 robberies in Puerto Rico, which is a rate of 166.4 robberies per 100,000 inhabitants.[7] This is over fifty percent higher than the United States robbery rate of 109.1 per 100,000 inhabitants.[8] It is a wellknown fact that robberies in Puerto Rico almost always involve firearms—not knives or old fashioned revolvers, but state of the art semi-automatic and automatic pistols of potent calibers.

As stated above, there is no denying that violent crime has been insufficiently addressed by the Puerto Rico local court system, by the Department of Education, and by the Executive Branch of government. *Cf. Colon–Vazquez v. Department of Educ. of Puerto Rico*, 46 F.Supp.3d 132 (D.P.R.2014) (discussing the failures of the public education system in Puerto Rico). In 2011, Puerto Rico had a record 1,136

reported murders—a rate of 30.6 per 100,-000 people; the robbery rate was 174.4 per 100,000 with 6,465 reported cases.[9] The problem is not just in the streets, but in the enforcement of laws as well. Plagued by the systemic deficiencies in the Puerto Rico Police Department's policies and procedures, Puerto Rico entered into an agreement with the federal government titled the "Agreement for the Sustainable Reform of the Puerto Rico Police Department". (*See United States v. Puerto Rico*, D.P.R. Case No. 3:12–cv–02039, ECF No. 60). That agreement seeks to reform the Puerto Rico Police Department, bringing it in compliance with the laws and Constitution of the United States and Puerto Rico.

To combat the wave of violent crime on the island, the Puerto Rico Department of Justice and the federal government determined that a change was necessary. Since 2011, the primary prosecution of violent crimes has shifted to the federal system in many matters where there is concurrent jurisdiction with Puerto Rico. As a result, the United States District Court for the District of Puerto Rico has, in practice, assumed nearly all cases of importance that normally would be handled by state courts.

by volume_and_rate_per_100000_inhabitants_1994–2013.xls (last visited Jul. 17, 2015).

5. Andrew O'Reilly, *Plagued by Violence, Bad Economy, Puerto Rico Rings in 2014 with Bang; 13 Murders in 5 Days*, Fox News Latino (Jan. 8, 2014), http://latino.foxnews.com/latino/news/2014/01/08/plagued–by–violence-bad–economy–puerto–rico–ringsin–2014–with–bang–13–murders/.

6. The World Bank, http://data.worldbank.org/indicator/VC.IHR.PSRC.P5?order=wbapi_data_value 2012wbapi_data_valuewbapi_data_value-last&sort=asc. (last visited July 17, 2015).

7. Fed. Bureau of Investigation, Crime in the United States by State, 2013, https://www.fbi.gov/about-us/cjis/ucr/crime–in–the–u.s/2013/crime–in–the–u.s.–2013/tables/5tabledata

decpdf/table_5_crime_in_the_united_states_by_state_2013.xls. (last visited July 17, 2015).

8. Fed. Bureau of Investigation, Crime in the United States by Volume and Rate Per 100,000 Inhabitants, 1994–2013, https://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s2013/tables/1tabledatadecover viewpdf/table_1_crime_in_the_united_states_by_volume_and_rate_per_100000_inhabitants_1994–2013.xls. (last visited July 17, 2015).

9. Fed. Bureau of Investigation, Crime in the United States by State, 2011, https://www.fbi.gov/about–us/cjis/ucr/crime–in–the–u.s/2011/crime–in–the–u.s2011/tables/table–5 (last visited 7/20/2015).

The terms of the agreement between the federal and local governments are confidential; however, it is public knowledge that the agreement has existed since November 2011. It is no secret that the Puerto Rico Police Department is understaffed, which directly relates to its ability to adequately investigate criminal matters. The purpose of the agreement is for the referral and handling of cases by federal authorities, where there is concurrent state and federal jurisdiction, in order to target violent offenders in illegal possession of firearms and to address major drug trafficking using Puerto Rico as a land base. Working together, federal, state, and local authorities aim to reduce crime and increase the quality of life in Puerto Rico. By allowing the federal authorities to take primary prosecution over certain crimes for which it has concurrent jurisdiction, the Puerto Rican authorities are freed up to dedicate their resources to investigate and support prosecutions at a more manageable level.[10]

This shift has led to a markedly different criminal process for the violent offenders in Puerto Rico. In Puerto Rico, criminal defendants are constitutionally guaranteed a right to bail in all felony cases, even the most violent offenders. Previously, when prosecuted under Puerto Rico's jurisdiction, even violent offenders were rarely detained pending their trial. When prosecuted under the federal system, the majority of these violent offenders remain off the streets and unable to commit further offenses pending their trials.

Since 2011, the court has witnessed how the joint work between the federal system and Puerto Rico's Police Department and Department of Justice has led to both an influx of violent crime prosecutions in this court *and* a decrease in the violent crime rate. The message from both levels of government is clear—we must no longer allow Puerto Rico to be overrun by violent crime. Puerto Rico and the federal government are working together to prosecute these matters in the federal system—where justice is swift and not for sale by favoritism, custom and usage, indolence, abdication, or even resignation. It is a duty of this court to penalize the criminals and protect the citizens of Puerto Rico—who are also, though it is sometimes forgotten, citizens of the United States.

Defendant Carmelo R. González–Román ("González–Román") is part of the firearms problem in Puerto Rico. González–Román pleaded guilty to knowingly brandishing a firearm during a crime of violence. At first sight, this offense seems to be a run-of-the-mill heartland case; but it is not. At his sentencing hearing, we determined that an upward variance, greater than the one stipulated by the parties, was necessary due to the horrific details of the crime.

Formal Judgment will enter five days after the entry of this memorandum to allow defense counsel an opportunity to react in the event that our analysis here is dramatically opposed to what transpired at the sentencing hearing.

---

**10.** That is not to say that Puerto Rico's law enforcement has given up its authority to prosecute narcotics and firearms cases or cases of violent crime. On the contrary, in recent years the Puerto Rico Criminal Justice System has engaged in a strategic plan to clean up Puerto Rico, both on the streets (*see Puerto Rico Criminal Justice System Strategic Plan for the Fiscal Years 2014–2018*, Puerto Rico Department of Justice, (submitted December 2013), www.iir.com/bja-state-factsheets/PDF/Strategies/PR–Strategic–Plan.pdf), and inside its Police Department (*see United States v. Puerto Rico*, D.P.R. Case No. 3:12–cv–02039, ECF No. 60).

## II.

### *A Sample of What Goes On— The Guaynabo Massacre*

Less than two weeks before González–Román committed the acts that form the basis of his conviction here, an event happened that shredded the fragile fabric of Puerto Rico's security blanket. We discuss it here to illustrate the violence that Puerto Ricans fear on a daily basis and to provide insight into the mindset of the community.

On November 17, 2014, two armed men entered a home in the gated community of Urbanization Los Frailes in Guaynabo, Puerto Rico,[11] that belonged to a retired U.S. Army officer who taught courses at the American Military Academy in Guaynabo,[12] and owned a rental property in Bayamón. The two men murdered the retired military man, his wife, and his mother-in-law. The man was gagged and shot to death against a sofa in the living room, while the two women were made to kneel down nearby and were then shot. The men then abducted the murdered soldier's two sons aged fifteen and thirteen. The men then executed the fifteen-year-old boy and left his body on a nearby road. They attempted to execute the thirteen-year-old boy, but the gun was empty. Instead, the men beat and stabbed the boy and threw his body off a bridge. Miraculously, the thirteen-year-old survived. The above event will hereinafter be referred to as "the Guaynabo Massacre" as it is known throughout the island.[13]

The Guaynabo Massacre was the seventh multiple killing in Puerto Rico in 2014.[14] These killings can happen everywhere, not just in low-income housing projects.[15] Here, violent crime takes place at normal hours of the day, at high-end shopping centers, food courts like the one in

---

**11.** The First Circuit has recognized Puerto Rico's attempt to abate crime by allowing communities to control access to public streets. *See Watchtower Bible and Tract Society of New York, Inc. v. Municipality of San Juan*, 773 F.3d 1, 5 (1st Cir.2014) ("In response to an epidemic of violent crimes, the Commonwealth enacted the Controlled Access Law (CAL), P.R. Laws Ann. tit. 23, §§ 64–64h, which allows municipalities to authorize neighborhood associations to erect gates enclosing public streets. *See Watchtower I*, 634 F.3d at 6–7; *see also* P.R. Laws Ann. tit. 23, § 64. These gated communities are called 'urbanizations.' ").

**12.** Urbanization Los Frailes is considered an upscale neighborhood just outside metropolitan San Juan and has on-site security.

**13.** *See In Cold Blood, Four Members of Same Family Murdered in Puerto Rican Luxury Neighborhood*, Fox News Latino (November 18, 2014), http://latino.foxnews.com/latino/news/2014/11/18/in-cold-blood-four-memberssame-family-murdered-in-puerto-rican-luxury/; *Puerto Rico Police Investigating Murder of Family in Luxury Neighborhood*, Caribbean News Desk (November 18, 2014), http://caribnewsdesk.com/news/8958–puerto–rico–police–investigatingmurder–of–family–in–luxury–neighborhood; and Police in Puerto Rico Investigate Murder of Military Family, Reuters (November 18, 2014), http://www.reuters.com/article/2014/11/18/us-usa-puerto-rico-murders-idUSKCN0J22I020141118.

**14.** *Police in Puerto Rico Investigate Murder of Military Family*, Reuters (November 18, 2014), http://www.reuters.com/article/2014/11/18/us-usa-puertorico-murders-idUSKCN0J22I020141118.

**15.** We do not intend to demean or be disrespectful to the many law-abiding citizens who live in the projects. However, it is a fact that these projects are run by violent drug-trafficking organizations that make up part of our criminal docket on a daily basis. Multi-defendant cases arising out of those locations can be sixty to one-hundred defendants. For example, a recently returned indictment has 105 defendants, ten murders, and a host of firearms-related charges. It involves a RICO drug conspiracy and gang wars bridging various public housing projects—a literal no man's land.

the upscale San Patricio Plaza, parking lots of a Walgreens or movie theater, while driving on the highways, during sporting events,[16] even in front of the federal courthouse where this very court sits. The island is thirty-five miles wide by 100 miles long and, contrary to what happens in the New England sister districts, there are no safe haven suburbs to find peace and protection—violent crime occurs on every corner all over the island and everyone is at risk twenty-four hours a day, seven days a week.

## III.

### *Facts*

On December 1, 2014, at approximately 7:30 a.m., González–Román and an unknown individual invaded a home in Luquillo, Puerto Rico.[17] Three residents were home at the time of the invasion—a husband, wife, and daughter. The house alarm was not armed. The assailants targeted this particular house because they knew the husband was a successful businessman in the area. To enter the house, the two assailants used physical force, violence, and intimidation, and González–Román brandished a black pistol with an extended high-capacity magazine.[18] Once inside, while pointing the pistol at the neck of one of the victims, the two assailants used duct tape to tie the victims to chairs.

Having immobilized the victims, the assailants searched the house for items to steal. González–Román demanded to know whether there was a gun in the house and threatened to kill the husband if he refused to tell the assailants the location of the weapon. The husband told the assailants that there was a handgun in a nearby bag. González–Román located the bag and removed from it a black and gray Wilson Combat 9mm handgun, which he then kept.

While in possession of at least two weapons—the black pistol carried into the house and the 9mm handgun—the assailants demanded that the family give them the money located in the house. When the family denied keeping significant cash at home, the assailants began banging on the walls in search for a safe. After finding nothing, the assailants decided to take one of the victims to get cash. During this time, González–Román unloaded the bullets from the 9mm handgun and then began pulling its trigger as a method to scare the victims. He stated that he had thirty-two rounds of ammunition to distribute among the three of them and repeatedly asked the victims to decide which one of them was going to die first.

16. *Two Shot While Competing at 70.3 Puerto Rico* TRIATHLETE, March 16, 2015. http://triathlon.competitor.com/2015/03/news/2–shot–competing–70–3–puerto–rico_113800.

17. The term "home invasion" is of new coinage. Those of us who remember our common law criminal law classes would categorize them as armed burglaries of the worst kind, *i.e.,* a combination of burglary and armed robbery, with people present and living in the home.

18. The 1994 federal Violent Crime Control and Law Enforcement Act, which amended the 1968 Gun Control Act, made it illegal to transfer or possess "large capacity ammunition feeding devices" not lawfully possessed on or before the law's enactment. The act defined "large capacity ammunition feeding device" as "a magazine, belt, drum, feed strip, or similar device . . . that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition." The act included a sunset clause, under which the ban expired after ten years, on September 13, 2004. Here, when the court says "extended high capacity magazine" for us it means a magazine that accepts more than fifteen rounds of ammunition. The reason for that being, for example, that a Glock .40 caliber has a fifteen-round standard magazine.

Knowing that the husband was a local businessman and unsatisfied with the lack of cash in the house, González–Román threatened to abduct the daughter. Instead, while the second assailant stayed at the residence with the husband and daughter who remained bound to the chairs with duct tape, González–Román abducted the wife, forced her into her daughter's Honda CRV and drove fifteen miles to an Automatic Teller Machine (ATM) in Canóvanas, Puerto Rico. Without much traffic, this trip would typically take about thirty to forty-five minutes. Once in Canóvanas, González–Román forced the wife to withdraw $500, the maximum amount allowed to be withdrawn from an ATM within twenty-four hours in Puerto Rico. González–Román then drove her even further from her home in Luquillo to a bank in Carolina, Puerto Rico. There, he forced her to enter the bank and withdraw another $2,000 in cash. González–Román then drove the wife nearly an hour back to Luquillo, where her husband and daughter continued to remain tied up and held captive by the second assailant.

Once they had returned to the house, González–Román put all the victims inside a room and directed them not to come out. He also instructed them not to look for the Honda CRV and not to contact the authorities. They then left with the Honda CRV. The total lapsed time for the robbery, abduction, and carjacking was about four hours. The two assailants stole: $2,500 cash; two picture cameras with an approximate value of $400 each; a Sony cyber shot camera with an approximate value of $200; a Samsung TV, with an approximate value of $300; a gold chain with a crucifix, with an approximate value of $1,500; the victim's wedding ring, with an approximate value of $200; the keys of all the cars that the victims had, that is, a 2014 Volks-

wagen; a 2013 Kia, and a 2011 Honda, costing $500 to replace; the Wilson Combat firearm, with an estimate value of $900; and, of course, the 2011 Honda CRV.

Guaynabo Municipal Police located and arrested González–Román on December 22, 2014. During González–Román's arrest, the arresting officer recovered the black and gray Wilson Combat 9mm handgun from González–Román's waistband. For twenty-one days González–Román carried that handgun with him until he was caught by the police. He was charged in the Bayamón Superior Court with: i) Carrying and Use of a Firearm Without a License; and ii) Firing or Pointing Weapons. For his involvement in the robbery and abduction on December 1st, González–Román was charged in the Fajardo Superior Court with: i) two charges of Aggravated Restriction of Freedom by Means of Violence, Intimidation, Fraud or Deceit; ii) Kidnapping; iii) Aggravated Robbery; iv) Carrying and Use of Firearms without a License; and v) three charges of Firing or Pointing a Firearm.

On January 21, 2015, a Grand Jury in the United States District Court for the District of Puerto Rico indicted González–Román on four counts related to his acts on December 1, 2014: Count One–Interference With Commerce by Threats or Violence under 18 U.S.C. § 1951(a); Count Two—Possession of a Firearm During and in Relation to a Crime of Violence (the robbery in Count One) in violation of 18 U.S.C. § 924(c); Count Three—Carjacking in violation of 18 U.S.C. § 2119(1); and Count Four—Possession of a Firearm in Furtherance of a Crime of Violence (the carjacking in Count Three) in violation of 18 U.S.C. § 924(c).[19]

19. *See* discussion of P.R. Local Rule of Crim. P. 247 and case law *infra* pp. 286–87.

The Bayamón Superior Court convicted González–Román for carrying and use of a firearm without a license in violation of Article 5.04 of the Weapons Act of 2000, 25 L.P.R.A. § 458(c), and, on March 7, 2015, sentenced him to five years imprisonment. The second charge against González–Román was dismissed under T. 34 Ap. II, Rule 247, P.R. Local Rule of Crim. P. 247(a).

On March 24, 2015, González–Román pleaded guilty to Count Two of the federal Indictment against him, namely that he, "aided and abetted by another, knowingly used, carried, and brandished firearms of unknown makes and models, during and in relation to a crime of violence" in violation of 18 U.S.C. § 924(c)(1)(A)(ii). All charges against González–Román in the Fajardo Superior Court relating to the events on December 1, 2014, were dismissed on April 13, 2015.

The statutory mandatory minimum term of imprisonment for a conviction of 18 U.S.C. § 924(c)(1)(A)(ii) is eighty-four months, or seven years. The Plea Agreement, however, recommended a sentence of 120 months, or ten years, imprisonment, to run consecutive to the five-year sentence imposed in the Commonwealth Court Case.

We note that the Plea Agreement was for the firearm, not the carjacking or the armed robbery. However, contrary to what counsel pretends, we cannot evaluate a case with the blinders counsel proposes. The complete conduct must be considered. The colloquy at the sentencing hearing urged that we look at the firearm in a vacuum. We cannot do that; it would be an irresponsible act on the part of the court. This court will not adopt state court prac-

tices mentioned above, an invitation that we see too often before us these days.

A federal judge can decide to follow all plea agreements and let the parties be the ones setting the tone for the sentencing process; this is the easy route. No appeal, no risk of threats or reprisals against the judge, and, of course, being liked by all—defendant, prosecutors, and defense counsel. However, we think that sentencing is an integral function of the judicial process and, in performing that difficult job, we cannot surrender our honest conviction about the effects of a crime just to please others and avoid discord. This court is not willing to surrender its obligation, something that has plagued the criminal justice system in Puerto Rico to the detriment of the quality of life and the communities where we live.[20]

Appellate tribunals understand that trial judges who are as busy as we are cannot, in all cases, sit and write a variance memorandum. We urge the Court of Appeals to carefully scrutinize appellate records, presentence reports, and sentencing transcripts looking for the validation that the law requires considering the overwhelming number of sentencing proceedings we confront each year. We also urge appellate judges to descend and try some of the cases by designation in District Court, because it is one way of understanding firsthand what district judges have to go through in handling these matters.

## IV.

### *Analysis*

#### A. *Applicable Guidelines Range*

■ We must "begin all sentencing proceedings by correctly calculating the appli-

---

**20.** The described scenario is quite complicated. It is not only the fragility of judicial independence rules, and the high volume of cases. There are competent judges in the

local system, but the influence with local politicians has greatly affected the quality and commitment of many appointments.

cable guidelines range." *Gall v. United States,* 552 U.S. 38, 49, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007); *See also* U.S.S.G. § 1B1.1. As mentioned during the Sentencing Hearing, convictions under § 924(c) are not typical guidelines cases. The United States Sentencing Guidelines, Section 2K2.4(b) states (in pertinent part) that: "if the defendant [ ] was convicted of violating section 924(c) [ ] of title 18, United States Code, the guideline sentence is the minimum term of imprisonment required by statute. Chapters Three and Four shall not apply to that count of conviction." The minimum statutory sentence for a 18 U.S.C. § 924(c)(1)(A)(ii) offense is seven years (and up to life imprisonment). Thus, we start with a guideline sentence of seven years.

## B. *Variance Sentencing Absent Prior Notice of a Potential Departure*

 The court did not consider a departure under Chapter Five of the guidelines since there was no advance notice of intent to depart. After determining the guideline sentence of seven years, this court had to decide whether a variance was warranted. The First Circuit has noted the "substantial discretion vested in a sentencing court." *United States v. Flores–Machicote,* 706 F.3d 16, 20 (1st Cir. 2013). A sentence variance, unlike that of a departure from the sentencing guideline range, does not require prior notice of the court's intent to vary. *See United States v. Politano,* 522 F.3d 69, 75–76 (1st Cir. 2008) (no prior notice required for upward variance based on need for deterrence and seriousness of defendant's crime). "Although the advisory guidelines are the starting point and the initial benchmark, a sentencing judge may draw upon his familiarity with a case, weigh the factors enumerated in 18 U.S.C. § 3553(a), and custom-tailor an appropriate sentence." *Flores–Machicote,* 706 F.3d at 20–21 (internal citations and quotation marks omitted). The Court further explained that,

> a sentencing court may not mechanically assume that the [guideline sentencing range] frames the boundaries of a reasonable sentence in every case. Rather, the court must take a flexible, case-by-case approach: once the [guideline sentencing range] is properly calculated, sentencing becomes a judgment call involving an intricate array of factors. Consequently, punishment outside the [guideline sentencing range] may be warranted in a particular case to serve the objectives of sentencing.

*Id.* (internal citations and quotation marks omitted). When a variance is necessary, the reasons must "be rooted either in the nature and circumstances of the offense or the characteristics of the offender," and the factors we deem relevant "must add up to a plausible rationale for the sentence imposed and must justify a variance of the magnitude in question." *Id.* at 21 (internal citations and quotation marks omitted). "A sentencing court's obligation to explain a variance requires the court to offer a plausible and coherent rationale—but it does not require the court to be precise to the point of pedantry." *United States v. Del Valle–Rodriguez,* 761 F.3d 171, 177 (1st Cir.2014). The First Circuit recently reiterated that "a sentencing court may consider the incidence of crime (and the deterrent effect of a harsh sentence) in a particular community." *United States v. Santiago–Burgos,* 601 Fed.Appx. 9, 12 (1st Cir.2015) (affirming the district court's sentence after finding that the upward variance was both procedurally and substantively reasonable) (*citing Flores–Machicote,* 706 F.3d at 23). For the reasons that follow, we find that an upward variance greater than the one recommended by the parties is both justified and necessary in this case.

To determine the appropriate sentence here, we are guided by the numerous listed factors in 18 U.S.C. § 3553(a). We weigh these factors in order to craft a sentence that is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a); *See also* U.S. Sentencing Comm'n, Departure and Variance Primer, 1 (2013). During the sentencing hearing, the court stated the reasons for its upward variance, and explained why the sentence is "not of the kind, or is outside the range, described [by the guidelines, and] the specific reason for the imposition of a sentence different from that described." *See* 18 U.S.C. § 3553(c)(2). In crafting the imposed sentence of 144 months, we thoroughly considered all the section 3553(a) factors in this case. *See United States v. Santiago–Rivera*, 744 F.3d 229, 233 (1st Cir.2014).

■ In weighing the factors, we look at "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The nature and circumstances of this offense are particularly horrific. Armed with a pistol with an extended high-capacity magazine, González–Román forced his way into the victims' home and held not only one victim but *three* victims against their will at 7:30 in the morning. González–Román pointed the pistol at the victims and threatened to empty the thirty-two rounds of ammunition among them. While two of the victims were duct-taped to chairs for about four hours and watched over by the second assailant, González–Román abducted the third victim and drove her from Luquillo to Canóvanas to Carolina and back to Luquillo while she feared for her life and the lives of her husband and daughter whom she had left at the house in Luquillo. González–Román put the pistol to the victims' heads and repeatedly insisted that they should decide who he would kill first.

This is no run-of-the-mill firearms case even in the context of crimes of violence. The crimes perpetrated by González–Román were committed with prior calculation. During the robbery, González–Román commented that he knew the family had money because the husband was a successful businessman and drove a red Mercedes. Though he was wrong on the car make—the victims had previously driven a red Infinity, but had sold it two years prior—González-Román's knowledge of the victims' financial situation, home address, and work status all demonstrate that he specifically targeted this family ahead of time. González–Román gained entry into the house—the "castle"—by brandishing a pistol with an extended high-capacity magazine, not even two weeks after the Guaynabo Massacre. One can only imagine the level of the victims' fear, wondering whether they would end up the same as the victims in the Guaynabo Massacre.[21] González–Román then held two victims against their will—duct-taped to chairs for four hours—while he abducted the third.[22]

The court acknowledges that González–Román played no part in the Guaynabo Massacre. However, we cannot, should not, and will not ignore the circumstances of González–Román's crime and the impact that it had on his victims and the community. The family, his direct victims, no longer feel safe in their own home or outside in their back yard. At least one

21. Reference to the Guaynabo Massacre occurs in the victim impact statement—alerting this court that the facts of that horrific event were running through at least one of the victim's minds during their ordeal.

22. The abduction of the victim bears another resemblance to the Guaynabo Massacre during which the gunmen abducted the two sons and later executed one and left the other for dead.

has developed anxiety and insecurity. González–Román's four-hour long victimization of the family in Luquillo showed a complete disregard for human decency and human life. The level of cruelty and psychological torture inflicted by González–Román is not adequately contemplated by the guidelines. It is far outside the "heartland" of a typical case.

■■■ The sentence imposed should "(A) [ ] reflect the seriousness of the offense, [ ] promote respect for the law, and [ ] provide just punishment for the offense; (B) [ ] afford adequate deterrence to criminal conduct; [and, among other considerations,] (C) [ ] protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2). We have already discussed the seriousness of this offense, which was beyond the pale. As the First Circuit has stated:

> Community-based considerations are inextricably intertwined with deterrence, which aims to 'prevent [ . . . ] criminal behavior by the population at large and, therefore, incorporates some consideration of persons beyond the defendant.' Put another way, the incidence of particular crimes in the relevant community appropriately informs and contextualizes the relevant need for deterrence.

*Flores–Machicote*, 706 F.3d at 23 (citing *United States v. Politano*, 522 F.3d 69 at 74 (1st Cir.2008)). The First Circuit continued that, if "violent crime is running rampant, the judge reasonably may conclude that the need for deterrence is great—and this may translate into a stiffer sentence." *Flores–Machicote*, 706 F.3d at 23. We may look at such community-based considerations, so long as we also ground the sentencing determination in case-specific factors. *Flores–Machicote*, 706 F.3d at 24; *see also United States v. Zapata–Vazquez*, 778 F.3d 21 (1st Cir. 2015); *United States v. Rivera–González*,

776 F.3d 45, 50–51 (1st Cir.2015); *United States v. Narvaez–Soto*, 773 F.3d 282, 285–287 (1st Cir.2014); *cf. United States v. Ortiz–Rodriguez*, 789 F.3d 15 (1st Cir. 2015) (vacated and remanded because the sentencing court failed to adequately explain the case-specific reasons for imposition of a variance).

As illustrated above, violent crime is rampant in Puerto Rico. Gun violence, carjackings, home invasions, and the constant threat of assault have become so commonplace on the island that many citizens view it just as a way of life. The violent crime rate is so severe that throughout the island, in local communities, neighborhoods, and even the Puerto Rican government, additional steps are taken to protect the population from the crime surrounding them. For example, carjacking is so prevalent in Puerto Rico that the traffic laws require drivers not to linger at red traffic lights between the hours of midnight and 6:00 a.m. (*See* 9 L.P.R.A. § 5222(b)(6) "Vehicles traveling on public highways between twelve (12) midnight and five (5) o'clock in the morning, when facing a red light, shall stop and then continue driving, provided due precautions are taken.").

The prevalence of gated communities is another example of local attempts to protect citizens. The First Circuit has previously discussed the birth and necessity of these gated communities:

> The Controlled Access Law—adopted in 1987 and amended in 1988, 1992, 1997, and 1998—was prompted by and adopted against a background of endemic violent crime. Puerto Rico, with a median household income only about one-third of the U.S. national average and less than half of every other state, has a homicide rate quadruple the U.S. national rate and more than double that of virtually every state. It is a major drug transit point, and drug dealing has

led in a number of cases to corruption among local police. The statute, as currently amended, authorizes municipalities to grant permits to neighborhood homeowners' associations called urbanizations to control vehicular and pedestrian access to the public residential streets within the urbanization (the term referring either to the association or to the controlled area). In such cases, the area is enclosed with fencing or other barriers and with one or more entry and exit gates for pedestrians and vehicles. P.R. Laws Ann. tit. 23, § 64. Some of the gates are manned by security guards paid by the association; others are unmanned and opened by a key or by an electric signal operated by a buzzer linked to the residences within the urbanization.

In some respects, the controlled access regime is a counterpart to the private "gated" residential communities that have developed elsewhere; but in Puerto Rico the streets within the area were and remain public property, and the municipality is closely involved in authorizing the urbanization. To obtain a permit, the residential community must create a residents' association; propose a plan describing the permanent barriers and access arrangements; file a petition supported by at least three-quarters of the residential homeowners; and assume the costs of installing and operating the plan. P.R. Laws Ann. tit. 23, § 64a.

* * *

The Puerto Rico Supreme Court has upheld the constitutionality of the Controlled Access Law, *Asociación Pro Control de Acceso Calle Maracaibo, Inc. v. Cardona Rodríguez (Maracaibo)*, 144 D.P.R. 1, 1997 WL 870832 (1997), stressing that the enclosed areas remain public property, *id.* at 28–29, 32, and that "if any regulation approved by any [urbani-

zation] violates constitutionally protected rights, the same will be considered null and void," *id.* at 27–28. Administration of an approved regime is left to the individual municipality and urbanization. *Id.* at 26.

Dozens of municipalities have issued permits to hundreds of urbanizations that encompass in total tens of thousands of residences

*Watchtower Bible and Tract Society of New York, Inc. v. Sagardia De Jesus*, 634 F.3d 3, 6–7 (1st Cir.2011).

Perhaps the most revealing attempt to protect Puerto Ricans from the violent crime of the island is the Puerto Rico Department of Justice's request that the federal government handle a significant number of the Commonwealth's violent crimes for which there is concurrent jurisdiction. Despite these cases typically being prosecuted at the state level, in Puerto Rico the federal system has taken on the role of primary investigation and prosecution for the most violent offenses. That is what happened in this case. Originally charged under Puerto Rico law, the federal system took over the prosecution of González–Román for the events he took part in on December 1, 2014. Once González–Román reached a plea agreement in federal court, the state charges were dismissed.

González–Román is a part of the violent crime that suffocates this island. His disregard for human life—shown, *inter alia*, by the cruel way he asked the victims to choose their own death order—clearly fits into the larger picture of rampant violent crime on the island. Moreover, as part of this very robbery, González–Román stole yet another gun that could be used in violent crime. Deterrence of violent crime is greatly needed, and one way to achieve

that is by imposing an upward variance on a heinous crime of violence such as this.

González–Román pleaded guilty only to Count Two of the Indictment: "That on or about December 1, 2014, in the District of Puerto Rico and within the jurisdiction of this Court, [he] aided and abetted by another, knowingly used, carried, and brandished firearms of unknown makes and models, during and in relation to a crime of violence, as charged in Count One of this Indictment, for which they may be prosecuted in a court of the United States, that is, Interfering with Commerce by Threats or Violence, in violation of [18 U.S.C. § 1951]." All in violation of 18 U.S.C. § 924(c)(1)(A)(ii). Though he pleaded guilty only to the firearms charge, González–Román admitted that he entered the victims' home uninvited on December 1, 2014; that he brandished a firearm and tied the victims to chairs using duct tape; that he stole a second firearm from the residence; that he searched the house for a safe; that he kidnapped one of the victims and drove her to two separate locations on the island in order to take $2,500 in cash from the victims; that he stole the victims' Honda CRV; and that when he was arrested on December 22, 2014, he was in possession of the gun he stolen from the victims. These facts paint a much more frightening picture than a "mere" § 924(c) violation.

González–Román terrorized more than just the three victims on December 1, 2014. All citizens of Puerto Rico have suffered by the defendant's actions. Indeed, an invasion of a victim's home is one of the "most damaging crimes to society." See Taylor v. United States, 495 U.S. 575, 581, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990) (citing H.R.Rep. No. 98–1073, at 1, 3

(1984)). In a jurisdiction whose citizens lack faith in the ability of local law enforcement and justice system to provide adequate protection,[23] a crime with the facts such as those presented here demands an upward variance.

We also considered the kinds of sentences available; at what kinds and range of sentences were established by the guidelines for such an offense; and at any pertinent policy statements issued by the Sentencing Commission. See 18 U.S.C. § 3553(a)(3)–(5). We also considered the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, but that was inapplicable in this case. See 18 U.S.C. § 3553(a)(6). None of these factors weighs against an upward variance.

Finally, we considered the mitigating factors presented by the defense and discussed them in open court. We noted the defense argument that González–Román has been diagnosed with Attention Deficit Hyperactivity Disorder, was enrolled in the special education program as a child, and that his IQ was "borderline." However, we listened to González–Román's allocution at the sentencing hearing, and we do not feel that the sophisticated thoughts conveyed therein suggested someone with such diminished capacity that it warranted a lesser sentence. We considered these arguments, but they are insufficient to change our sentencing decision. See Santiago–Rivera, 744 F.3d at 233.

González–Román is sentenced to 144 months imprisonment, to run consecutive to his sixty-month term of imprisonment in the Commonwealth system, and five years of supervised release. He shall serve out

---

**23.** See Puerto Rico Criminal Justice System Strategic Plan for the Fiscal Years 2014–2018, Puerto Rico Department of Justice, (submitted December 2013), www.iir.com/bja-statefact-sheets/PDF/Strategies/PR-Strategic-Plan.pdf.

his federal sentence before being returned to the Commonwealth's custody. We order that the federal sentence be served first because of our experience of erratic detainer mismanagement by local corrections that have led in the past to unwarranted releases of federally-detained individuals.

No one should get the impression that this court believes that an upward variance is always necessary here in Puerto Rico. The determination of a reasonable sentence *must* be conducted on a case-by-case basis. Sometimes, the circumstances will warrant a sentence below the guideline range, and sometimes, as they do here, the circumstances will warrant a sentence above the guideline range. The court arrived at its sentence of 144 months only after careful consideration of the length of sentence that would be sufficient to penalize González–Román for his actions and deter him and other would-be-criminals from repeating these actions in the future.

### C. *The 144–month sentence is supported under the analysis of a typical guidelines case*

To illustrate the reasonableness of this court's upward variance, we performed a guideline calculation during sentencing for what González–Román would have been facing had this been a typical guidelines case. Taking into account all of the relevant conduct (U.S.S.G. § 1B1.3), it would result in a range as follows. The calculation is also contained in the PSR.

González–Román pleaded guilty to Count Two of the Indictment: Title 18, U.S.C. § 924(c)(1)(A)(ii)-Possession and Brandishing of a Firearm in Furtherance of a Crime of Violence, a class "A" felony. The statutory penalties for this conviction are a minimum of seven years to a maximum of life imprisonment, followed by no more than five years of supervised release and a fine of not more than $250,000. The guideline for an 18 U.S.C. § 924(c)(1)(A)(ii) offense is found in Section 2K2.4 of the Guidelines. That section provides that if the defendant was convicted of violating 18 U.S.C. § 924(c)(1)(A)(ii), the guideline sentence shall be at least the minimum term of imprisonment required by statute. U.S.S.G. § 2K2.4(b). Thus, we start with the minimum sentence of eighty-four months up to life imprisonment.

Next, we review González–Román's criminal history. On March 7, 2015, in Commonwealth Court, he was convicted of a violation of Article 5.04 of the Puerto Rico Weapons Law (carrying and use of firearms without a license) and was sentenced to five years of imprisonment.[24] For the March 7, 2015 conviction, he receives three points for his criminal history under U.S.S.G. § 4A1.1(a), and his total criminal history score is three. According to the sentencing table in U.S.S.G. Chapter 5, Part A, a criminal history score of three establishes a criminal history category of II.

Had this plea included the underlying offense of Count One—interference with commerce by threats or violence under 18 U.S.C. § 1951(a), González–Román would have been facing a Base Offense Level of twenty, plus five levels for brandishing a firearm, plus four levels for abduction, plus two levels for carjacking, plus one level for theft of the gun, less three levels for acceptance of responsibility, bringing the Offense Level to twenty-nine with a guideline range of 97–121 months. He also faced an additional eighty-four months mandatory

---

**24.** The March 7, 2015, conviction arises out of his arrest on December 22, 2014, for his involvement in the underlying crime of this matter. During González–Román's arrest, police removed from his person the gun he stole on December 1, 2014.

for the § 924(c)(1)(A)(ii) conviction. Thus, González–Román faced 181 months minimum.[25] However, we note that the discussion at the sentencing hearing and in this memorandum totally forgets the fact that there was a second § 924(c)(1)(A)(ii) charge in Count Four, which, had this been a straight plea or conviction after trial, would have resulted in a statutory mandatory minimum of twenty-five years in addition to the sentence imposed for Count One. 18 U.S.C. § 924(c)(1)(C)(i) ("In the case of a second or subsequent conviction under this subsection, the person shall ... be sentenced to a term of imprisonment of not less than 25 years[.]").

The court has engaged in this calculation in an effort to ascertain how the guidelines would treat the full extent of González–Román's admitted conduct. Though we refrain from determining the sentence based solely on the "real offense" instead of the convicted offense, this calculation exercise provides some guidance to the court on how the trained professionals at the U.S. Sentencing Commission view the overall seriousness of all of the conduct at issue herein and assists in eliminating the "view my conduct in a vacuum" arguments raised by the defendant. For these reasons, the imposition of the 144–month sentence is supported under the analysis of a typical guidelines case.

## D. *Departure Factors and Their Relevance to a Variance Sentence*

During the sentencing hearing, the court also examined the defendant's exposure under the departure guidelines, again as a benchmark for the reasonableness of the imposed sentence. *We declined, however, to rely on this analysis in support of a departure as no prior notice had been given.* But, there is no case law preventing a court from looking at established measures of criminal conduct such as those contained in the departure section when crafting a reasonable sentence. Reason dictates that if a court can consider all relevant conduct (U.S.S.G. § 1B1.3) when crafting a sufficient and reasonable sentence, the court may surely consider conduct specifically listed by the guidelines as relevant in the variance analysis.

As we announced in open court, *we are not employing a departure* because this is not a typical guidelines case, nor did we notify González–Román of our intent to depart. Nonetheless, we may consider the departure factors when looking at the totality of the case to craft a sentence. The Sentencing Guidelines Manual states that

The Commission intends the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.

U.S. Sentencing Comm'n Guidelines Manual, 6 (2014).

As we explained during sentencing, one factor we may consider is the defendant's prior charged conduct. González–Román was previously arrested on March 1, 2014, for violations of Puerto Rico weapons laws.

---

25. During the sentencing hearing, we quickly calculated the guideline range for illustration using an Offense Level of twenty-seven, then, despite having already given the three-level reduction for acceptance of responsibility, we gave another three levels because the calculation was merely to show the reasonableness of the 144–month sentence. Under the Offense Level of twenty-four, González–Román faced fifty-seven to seventy-one months, plus eighty-four months on the § 924(c)(1)(A)(ii) conviction. Even after giving him a six-level reduction, González–Román faced a minimum of 147 months.

Although the charges against him were dismissed, the arrest, along with the use of the pistol on December 1, 2014, his theft of a gun from the victims in this case, and the fact that he was carrying a firearm on December 22, 2014, when he was arrested, paints a clear pattern of unlawful behavior that is underrepresented by the number of convictions.

According to § 5K2.21 of the Guidelines, "Dismissed and Uncharged Conduct,"

The court may depart upward to reflect the actual seriousness of the offense based on conduct (1) underlying a charge dismissed as part of a plea agreement in the case, or underlying a potential charge not pursued in the case as part of a plea agreement or for any other reason; and (2) that did not enter into the determination of the applicable guideline range.

Here, the dismissed conduct was yet another weapons violation in the same calendar year. The Commonwealth court dismissed the charges under Local Rule 64, which is the rule requiring a speedy trial, without any explanation, calculation, or discussion of the merits. Our daily examinations of PSI reports over the years, raise serious red flags because dismissals of very serious crimes are a common event by referencing P.R. Local Rule of Crim. P. 247 (which if no reason is given, the dismissal is void, *People v. Superior Court*, 94 P.R.R. 56 (1967)), and under the unworkable antiquated local speedy trial disposition of P.R. Local Rule of Crim. P. 64. Though these dismissals are generally without prejudice, the reality is that the local system is so overwhelmed that cases are not refiled and defendants walk out free without consequence. As a result, respect for the law is lost and deterrence is practically non-existent. This creates a situation in which a defense strategy is to prolong a case, which will then end in dismissal without more. Given this court's familiarity with the Commonwealth courts' handling of criminal matters, the court considers these realities when calculating a final sentence.

Additionally, as we explained in the Sentencing Hearing, this crime would fit within the § 5K2.8 provision for "Extreme Conduct," which states that,

If the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim, the court may increase the sentence above the guideline range to reflect the nature of the conduct. Examples of extreme conduct include torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation.

That is most certainly the case here. González–Román and his accomplice entered a family's home—their castle—at 7:30 in the morning, brandishing a pistol with an extended magazine. Two of the victims were tied up using duct tape and muzzled for four hours. González–Román abducted one victim and drove her from her residence to two different cities in a frightening search for more cash. According to one victim, González–Román put a pistol to the victims' heads and insisted that they decide who he should kill first. That victim said that González–Román asked them one by one, and that he continued to insist that one of them would decide which of their family was going to be the first to die. Finally, González–Román put all the victims inside a room in the house and told them not to come out, while he and his accomplice stole one of the victim's cars. Once again, the cruelty and psychological torture inflicted by González–Román is far outside the "heartland" of a typical case.

### E. Supervised Release

We may impose a term of supervised release of not more than five years. 18

U.S.C. § 3583(b)(1). González–Román is ineligible for probation because it is expressly precluded by statute. 18 U.S.C. § 3561(a)(2).

## V.

### *Conclusion*

For the foregoing reasons, we sentence González–Román to 144 months imprisonment, to be served prior and consecutive to his term of sixty months imprisonment in the Commonwealth system. We further sentence him to five years of supervised release. The conditions of the supervised release appear in the record.

**IT IS SO ORDERED.**